801 A.2d 295 (2002)
173 N.J. 258
In re PSE & G SHAREHOLDER LITIGATION.
Dr. Steven Fink and Dr. David Friedman, P.C. Profit Sharing Plan, derivatively on behalf of and for the benefit of Public Service Enterprise Group, Incorporated and Public Service Electric & Gas Company, Plaintiffs-Appellants,
v.
Lawrence R. Codey; E. James Ferland; Leon R. Eliason; Steven E. Miltenberger; Joseph J. Hagan; and Stanley LaBruna, Defendants-Respondents,
and
Public Service Enterprise Group Incorporated and Public Service Electric & Gas Company, Nominal Defendants-Respondents.
A. Harold Datz Pension and Profit Sharing Plan, Plaintiff-Appellant,
and
Gail Dorff, derivatively on behalf of and for the benefit of Public Service Enterprise Group, Incorporated and Public Service Electric & Gas Company, Plaintiff,
v.
Lawrence R. Codey; E. James Ferland; Leon R. Eliason; Steven E. Miltenberger; Joseph J. Hagan; and Stanley LaBruna, Defendants-Respondents,
and
Public Service Enterprise Group Incorporated and Public Service Electric & Gas Company, Nominal Defendants-Respondents.
Public Service Enterprise Group Incorporated by G.E. Stricklin derivatively in her capacity as a shareholder, Plaintiff-Appellant,
v.
E. James Ferland; Irwin Lerner; Marilyn M. Pfaltz; Richard J. Swift; Lawrence R. Codey; Ernest H. Drew;
James C. Pitney; T.J. Dermot Dunphy; Raymond V. Gilmartin; Josh S. Weston and Steven E. Miltenberger, Defendants-Respondents,
and
Shirley A. Jackson, Defendant,
and
Public Service Enterprise Group Incorporated, Nominal Defendant-Respondent.
Supreme Court of New Jersey.
Argued February 26, 2002.
Decided July 23, 2002.
*297 *298 *299 *300 Ruthann Gordon, a member of the Pennsylvania bar, Philadelphia, PA, argued the cause for appellants Dr. Steven Fink and Dr. David Friedman, P.C. Profit Sharing Plan and A. Harold Datz Pension and Profit Sharing Plan (Cohn Lifland Pearlman Herrmann & Knopf, attorneys, Saddle Brook; Ms. Gordon and Peter S. Pearlman, Saddle Brook, on the briefs).
Mark C. Rifkin, a member of the Pennsylvania, Paoli, PA and New Jersey bars, argued the cause for appellant G.E. Stricklin (Sherman, Silverstein, Kohl, Rose & Podolsky, attorneys, Pennsauken; Mr. Rifkin and Alan C. Milstein, Pennsauken, on the briefs).
Harold G. Levison, New York City, argued the cause for respondents Lawrence R. Codey, E. James Ferland, Irwin Lerner, Marilyn M. Pfaltz, Richard J. Swift, Ernest H. Drew, James C. Pitney, T.J. Dermot Dunphy, Raymond V. Gilmartin, Josh S. Weston; and Michael R. Griffinger, Newark, argued the cause for respondents Steven E. Miltenberger, Leon R. Eliason, Joseph J. Hagan and Stanley La-Bruna. (Kasowitz, Benson, Torres & Friedman and Zazzali, Fagella & Nowak, New York City, for Lawrence R. Codey and E. James Ferland; Connell, Foley & Geiser and William E. Frese, Newark, for Public Service Enterprise Group Incorporated and Public Service Electric & Gas Company; Gibbons, Del Deo, Dolan, Griffinger & Vecchione, Newark, for Leon R. Eliason, Steven E. Miltenberger, Joseph J. Hagan and Stanley LaBruna; Mr. Levison, Mr. Griffinger, Mr. Frese, Kenneth I. Nowak, Newark and Kevin R. Gardner, Roseland, on the briefs).
Jason S. Feinstein, Trenton, submitted a letter in lieu of brief on behalf of amicus curiae, New Jersey Chamber of Commerce (Sterns & Weinroth, attorneys).
The opinion of the Court was delivered by VERNIERO, J.
We are called on to address certain questions of first impression regarding the *301 law of business organizations in New Jersey. The principal issue concerns the proper standard of review to be applied when evaluating whether a corporation's board of directors has responded properly in rejecting a shareholder's demand to commence legal action on the corporation's behalf. We hold that a modified version of the business judgment rule is the appropriate legal standard in such circumstances. Unlike the traditional approach, the modified business judgment rule places an initial burden on directors to demonstrate that they acted reasonably, in good faith, and in a disinterested fashion in arriving at their decision to reject a shareholder's demand or to terminate existing litigation. We further hold that the lower courts correctly applied that standard when dismissing the derivative litigation in this case.

I.
This appeal stems from four derivative actions brought by shareholders of Public Service Enterprise Group, Incorporated (Enterprise), a public utility holding company, and its wholly-owned subsidiary, Public Service Electric & Gas Company (PSE & G) (collectively, the company). Defendants are certain directors of both entities, and include current and former PSE & G officers. (For convenience, we do not distinguish between members of the Enterprise and PSE & G boards; unless otherwise indicated, we refer to them collectively as the Board.)
PSE & G operates the Salem and Hope Creek nuclear power plants located in southern New Jersey. During the relevant period, a series of malfunctions and safety violations plagued the Salem plant, causing federal regulators to assess significant fines against the company. Hope Creek also experienced problems, but not as frequently as those that had occurred at Salem. In a nutshell, plaintiffs allege that defendants recklessly mismanaged both facilities to the company's financial detriment.

A.
We recount the most noteworthy events. In February 1983, the Salem plant's reactor protection systems failed to operate automatically, requiring employees to shut down the reactors manually. Later, in November 1991, one of the turbines at the Salem plant exceeded its normal speed, causing parts of several blades to fly off its shaft. In December 1992, nuclear department managers were accused of harassing two engineers who tried to file an incident report in response to a safety concern at the plant. In that same month, an employee inadvertently turned off the plant's overhead annunciator system, which alerts plant employees to alarm conditions. That misstep went undetected by management and operations personnel for ninety minutes.
In 1993, management and equipment failures continued to plague the Salem facility. In June of that year, PSE & G shut down Salem unit two due to a failure in the rod control system. One year later, PSE & G shut down Salem unit one and declared an alert when marsh grass clogged that unit's water coolant system. In 1995, PSE & G shut down both Salem units because of a failure of two different pieces of equipment.
In 1995, problems also arose at the Hope Creek plant. In April, a release of radioactive material occurred during maintenance operations. Three months later, a planned shutdown went awry when the plant's operators left a discharge valve open, causing an increase in the reactor coolant temperature.
*302 The United States Nuclear Regulatory Commission (NRC) took action in response to each event at the Salem and Hope Creek facilities. After the 1983 shutdown, the NRC revised the Salem license, requiring remedial actions to assure the safe operation of the plant. Following each of the 1991, 1992, and 1993 incidents, the NRC sent a special team to conduct immediate safety inspections of the Salem plant. Due to the severity of Salem's 1995 malfunctions, the NRC prohibited PSE & G from re-starting either unit at Salem without the agency's prior approval. The NRC placed the plant on the agency's "watch list" in 1997.
In January 1995, the NRC issued its Systematic Assessment of Licensee Performance (SALP) rating of the Salem plant for the period June 20, 1993, to November 5, 1994. The NRC gave the Salem plant a "3" rating, the lowest possible score, in the Operations and Maintenance categories. That resulted in a 2.25 overall rating for the plant, placing it in the bottom quartile nationally. In March 1995, representatives of the NRC, including its executive director of operations, met with members of the Board in response to those SALP ratings. One Board member explained that a meeting of that nature was a "rare event." By the end of 1995, the NRC had assessed over $2 million in fines against PSE & G in response to the ongoing violations at the Salem and Hope Creek facilities. The SALP rating of the Hope Creek Plant also was lowered. Finally, another nuclear-utility oversight organization, the Institute of Nuclear Power Operations (INPO), issued poor ratings for both the Salem and Hope Creek plants.

B.
In response to the Salem and Hope Creek events, the Board took steps to gather information regarding the shortcomings of the facilities and the concerns raised by the NRC and INPO. Following the 1983 incident at the Salem plant, the Board created the Nuclear Oversight Committee (NOC) that was comprised of a Board liaison and outside experts in the nuclear energy field. The NOC was charged with receiving information regarding PSE & G's operations, preparing reports for the Board, and making recommendations based on that information. In 1995, the Board replaced the NOC, reconstituting it as a committee of the Enterprise board.
In 1994, PSE & G created its own Nuclear Review Board (NRB). Similar to the former NOC, the NRB is comprised of outside experts in the nuclear field and PSE & G senior nuclear personnel. The NRB's function is to review the nuclear operations of PSE & G and to provide counsel to both PSE & G's chief nuclear officer and the Enterprise board regarding the company's nuclear safety and operational performance. From 1983 to 1997, the Board also received information regarding nuclear operations from PSE & G's senior officers and other senior management personnel. Representatives of both the NRC and INPO attended Board meetings and advised that group directly regarding nuclear operations.
In 1989, the Board instituted a revitalization program at the Salem plant, in respect of which the company spent $300 million to upgrade equipment and facilities. The Board also intended the program to improve procedures and personnel. Those actions resulted in a favorable review by the NRC for the 1991-1993 period, although the agency noted that the company was slow in responding to some concerns. In 1994, after receiving an internal report that acknowledged the need to "change the culture" at Salem, the Board replaced its chief nuclear officer. However, as evidenced *303 by declining SALP ratings and the subsequent 1995 closure of the Salem plant, those changes had limited effectiveness.

C.
On October 4, 1995, following the closing of the Salem units, plaintiff G.E. Stricklin sent a demand letter to the Board asking it to institute suit against "each of its officers" for alleged mismanagement of the company's nuclear operations. Stricklin claimed that the Board's failure to take prompt action to correct the problems at the Salem and Hope Creek plants resulted in millions of dollars of damages to the company, only a portion of which could be recovered from ratepayers. Stricklin also alleged that members of the Board purposely had failed to disclose PSE & G's difficulties in a timely manner to ensure their re-election to the Board itself. Although she believed the demand effort to be futile, Stricklin designed her letter "to satisfy any conceivable requirement that a formal demand be made prior to the commencement of derivative litigation."
In response to Stricklin's letter, the Board adopted a resolution on October 17, 1995, retaining the law firm of Kasowitz, Benson, Torres & Friedman (the Kasowitz firm). The Board directed the firm to investigate the allegations raised in the demand letter.
On December 27, 1995, before the Kasowitz firm had completed its work, Stricklin filed a shareholder derivative complaint against defendants in the Superior Court, Law Division in Camden County. The complaint raises substantially the same allegations as the demand letter, and contends that Board members should be held personally liable for the company's financial losses. Plaintiff also asserts that her earlier demand on the Board had been rejected wrongfully because at the time of her complaint the Board had not acted in response to her demand.

D.
On February 13, 1996, the parties entered into a stipulation to extend time to answer or otherwise respond to the complaint so that the Board could complete its investigation. Shortly before that date, on February 8,1996, the Kasowitz firm issued a 124-page report regarding its investigation of Stricklin's demand. The firm focused its report on the period following January 1, 1993, because, among other reasons, Stricklin did not own stock in the company prior to that date.
The firm reviewed over 43,000 pages of documents, including Board minutes, internal reports, and documents generated by the NRC and other agencies. The firm also conducted over thirty interviews with Enterprise and PSE & G personnel. The firm did not interview plaintiff's representatives because they had refused the firm's request for a meeting. Based on its review, the Kasowitz firm concluded that there was no basis for Enterprise to institute legal action against any employee, officer, or director of Enterprise or PSE & G in respect of the Salem and Hope Creek facilities.
More specifically, the report concluded that the Board had attempted, in a diligent and good-faith manner, to address the issues at both the Salem and Hope Creek sites and to discover and remedy deficiencies in equipment and management. The report further determined that the Board had established an information network that ensured that the material issues that arose in the facilities were brought to the Board's attention promptly and completely. The report cited the NOC and its successor committee as the primary conduits for that information. The report also *304 found that the Board was informed sufficiently by independent nuclear experts.
The report addressed the steps that the Board had taken in response to the problems at the facilities. The report noted that the Board had changed reporting structures and created a new nuclear business unit to establish a greater familiarity with the company's nuclear business. Further, the report detailed the personnel changes made by the Board to improve the culture and management at the facilities. Finally, the report described plans like the 1989 Salem revitalization program instituted by the Board to upgrade equipment and facilities.
Based on those findings, the firm concluded that the members of the Board remained informed about the material issues regarding the Salem and Hope Creek sites and addressed those issues, to the extent that they could, in a timely and businesslike manner. After reviewing the applicable law, the firm determined that the directors' actions would be protected under the business judgment rule. The firm also found that the directors and officers would be protected by a provision in the company's certificate of incorporation that provides that directors and officers "shall not be personally liable to the corporation or its shareholders" for "breach of any duty owed to the corporation or its shareholders."
The report found no evidence that the Board had breached its duty to disclose information relating to the company's nuclear operations. Finally, the firm concluded that even if grounds for a suit did exist, instituting such litigation might not be in the company's best interests due to significant legal costs, negative publicity, and the effect on employee morale and recruitment. The firm also believed that a lawsuit would damage the company's relationship with the NRC.
While the Board was reviewing the Kasowitz report, two other sets of plaintiffs instituted separate suits against defendants in the Superior Court, Chancery Division in Essex County. Dr. Steven Fink and Dr. David Friedman, P.C. Profit Sharing Plan (Fink) filed suit on February 28, 1996, and A. Harold Datz Pension and Profit Sharing Plan and Gail Dorff (collectively, Datz) filed an action on March 5, 1996. Both complaints allege Board mismanagement of the Salem and Hope Creek sites. Fink and Datz, however, did not make a demand on the company prior to instituting suit. Instead, those plaintiffs assert that such demand would have been futile. Fewer in number as compared to the defendants named by Stricklin, the Fink and Datz defendants overlap to some extent with the Stricklin defendants. (The fact that some defendants may differ is not relevant to our disposition.)
In response to the Fink and Datz complaints, the Kasowitz firm submitted a supplemental report on March 14, 1996. The firm expanded the scope of its review to include the October 1989 to December 1992 time period. According to the supplemental report,
with respect to present or former officers and directors of Enterprise and PSE & G, and in connection with the general management of nuclear operations of the Salem and Hope Creek units ..., there is no evidence of any act or omission known or believed to be contrary to the best interests of Enterprise, its shareholders or PSE & G in connection with a matter in which there was a material conflict of interest; no evidence of bad faith or knowing violation of law; no evidence of any receipt of an improper personal benefit; and no evidence of gross negligence.
*305 As a result, the firm maintained its original recommendation that no litigation was necessary.
On March 19, 1996, the Board adopted a resolution accepting the Kasowitz firm's recommendations. Later, in deposition testimony or in individual certifications, each Board member gave several reasons for rejecting the litigation. Collectively, they cited: (1) the memorandum and reports presented by counsel, (2) the inquisitiveness and preparedness of Board members at meetings, (3) the open lines of communication and information in respect of the company's nuclear operations, (4) the depth of the information presented to the Board on a regular basis and its vigorous action in response to that information, and (5) the excessive cost of such litigation.

E.
Notwithstanding the Board's rejection of her demand, Stricklin proceeded with her action. In April 1996, her case was transferred from the Superior Court, Law Division in Camden County to the Chancery Division in Essex County, where the Fink and Datz actions had been venued. On July 3, 1996, a fourth shareholder, Tillie A. Greenberg, filed a complaint in the Chancery Division in Essex County, similar to the Stricklin complaint. The trial court consolidated the actions that same month.
Defendants moved to dismiss all four actions. The trial court denied that motion in December 1996. Specifically, the court excused Fink and Datz from the demand requirement, determining that the shareholders had alleged sufficient facts to create a reasonable doubt that the directors were disinterested or independent. The court ultimately concluded that all four plaintiffs had alleged sufficient facts to withstand dismissal. Defendants moved for leave to appeal that decision to the Appellate Division, which denied the motion, and to this Court, which also denied relief.
The consolidated cases were transferred to a different Chancery Division judge. In November 1997, the new judge bifurcated the Stricklin and Greenberg actions (which the court treated as demand-made cases) and the Fink and Datz actions (the demand-futile cases). In December 1997, defendants moved for summary judgment in the demand-made actions. In disposing of that motion, the trial court considered two critical questions. In re PSE & G Shareholder Litig., 315 N.J.Super. 323, 325, 718 A.2d 254 (Ch.Div.1998). The first issue focused on the appropriateness of the business judgment rule in evaluating the Board's decision to terminate the litigation. Ibid. The second question pertained to the scope of possible discovery to which the demand-made plaintiffs might be entitled. Ibid.
In a reported decision, the court adopted a modified version of the business judgment rule that places an initial burden on a corporation to establish the independence, good faith, and reasonableness of directors in rejecting a shareholder's complaint. Id. at 336, 718 A.2d 254. Further, the court ordered defendants to provide discovery to plaintiffs, "limited to the narrow issue of what steps the directors took to inform themselves of the shareholder demand and the reasonableness of its decision." Id. at 337, 718 A.2d 254.
In May 1998, defendants moved for summary judgment in the demand-futile actions. In an unreported opinion, the trial court reserved ruling on that motion based on its view that the standard of review that it had enunciated in its reported decision could not be applied to the Fink and Datz actions in the absence of discovery. Similar to its decision in the suit by the demand-made plaintiffs, the court permitted the demand-futile plaintiffs to conduct discovery *306 regarding the Board's disinterestedness, good faith, due care, and the reasonableness of its decision to terminate the litigation.
Following discovery, the trial court granted summary judgment in favor of defendants and against all plaintiffs. In an unreported decision, the court meticulously analyzed each allegation within the framework of the modified business judgment rule. Under that rubric, the court rejected both the demand-made and demand-futile claims. All plaintiffs except Greenberg appealed. Also in an unreported decision, the Appellate Division affirmed all aspects of the trial court's disposition.
We granted plaintiffs' petition for certification, 170 N.J. 386, 788 A.2d 771 (2001). We also granted amicus curiae status to the New Jersey Chamber of Commerce (Chamber). Although it agrees with the trial court's ultimate disposition, the Chamber argues that we should not alter the existing formulation of the business judgment rule in these circumstances.

II.
To resolve this dispute, we are required to analyze the interplay between two established, but sometimes competing, corporate doctrines. The first doctrine accords protection to corporate decision-makers to be free of unwarranted judicial intrusion when making business judgments on behalf of the corporation. The second tenet recognizes a shareholder's ability to redress perceived wrongs against the corporation by filing a derivative lawsuit when the entity's managers refuse to act. We must strike an appropriate balance between both doctrines. Because shareholder-derivative litigation is not an everyday occurrence in our courts, we are confronting some issues for the first time.

A.
We first review a basic principle, the business judgment rule. Having many facets, the rule is embedded in American corporate law. See R. Franklin Balotti and James J. Hanks, Jr., Rejudging the Business Judgment Rule, 48 Bus. Law 1337, 1337-40 (1993) (describing procedural and substantive aspects of business judgment rule). "The business judgment rule protects a board of directors from being questioned or second-guessed on conduct of corporate affairs except in instances of fraud, self-dealing, or unconscionable conduct." Maul v. Kirkman, 270 N.J.Super. 596, 614, 637 A.2d 928 (App. Div.1994).
One of the rule's purposes is to "promote and protect the full and free exercise of the power of management given to the directors." Ibid. (citing 3A William M. Fletcher, Fletcher Cyclopedia of Law of Private Corporations, § 1039 at 45 (perm. ed. rev. vol. 1986)). New Jersey courts have long accepted that
a decision made by a board of directors pertaining to the manner in which corporate affairs are to be conducted should not be tampered with by the judiciary so long as the decision is one within the power delegated to the directors and there is no showing of bad faith.
[Exadaktilos v. Cinnaminson Realty Co., 167 N.J.Super. 141, 151, 400 A.2d 554 (Law Div.1979).]
The business judgment rule "is a rebuttable presumption [.]" Maul, supra, 270 N.J.Super. at 614, 637 A.2d 928. It places an initial burden on the person who challenges a corporate decision to demonstrate the decision-maker's "self-dealing or other disabling factor." Ibid. (internal quotation marks and citation omitted). If a challenger sustains that initial burden, then the "presumption of the rule is [ ] *307 rebutted, and the burden of proof shifts to the defendant or defendants to show that the transaction was, in fact, fair to the corporation." Stuart L. Pachman, Title 14A-Corporations at 228 (2000) (citing Maul, supra, 270 N.J.Super. at 614, 637 A.2d 928).

B.
One recognized infringement on director autonomy is the shareholder-derivative action. As the name implies, "[a] shareholder derivative action permits a shareholder to bring suit against wrongdoers on behalf of the corporation, and it forces those wrongdoers to compensate the corporation for the injury they have caused." Bradley T. Ferrell, Note, A Hybrid Approach: Integrating the Delaware and the ALI Approaches to Shareholder Derivative Litigation, 60 Ohio St. L.J. 241 (1999) (footnote omitted). In that circumstance, "the cause of action actually belongs to the corporation, but a shareholder is permitted to assert the cause of action where the corporation has failed to take action for itself." Id. at 241-42 (footnote omitted).
Derivative litigation raises difficult and sometimes controversial issues. Id. at 242-43. One difficulty is that, although such litigation may compensate the corporation for injuries sustained as a result of wrongful conduct, it also may have a negative effect on corporate governance when frivolous lawsuits initiated by opportunistic shareholders are brought. Id. at 243. If abused, derivative litigation can impede the best interests of the corporation. Ibid. See also James D. Cox, Searching for the Corporation's Voice in Derivative Suit Litigation: A Critique of Zapata and the ALI Project, 1982 Duke L.J. 959, 960 (noting that because derivative-suit plaintiff "usually has no significant financial interest in the corporation, the possibly harmful economic effects of prosecuting the suit cannot be expected to guide his decision to litigate") (footnote omitted).
In response to those concerns most jurisdictions require as a prerequisite to derivative litigation that shareholders make a demand on the corporation's board of directors to act. Carol B. Swanson, Juggling Shareholder Rights and Strike Suits in Derivative Litigation: The ALI Drops the Ball, 77 Minn. L.Rev. 1339, 1341 (1993). The demand requirement serves at least two purposes. First, it provides corporate managers with the opportunity to address a shareholder's claims. Along those lines, if the board determines that the allegations are meritorious it may choose to remedy the situation internally or embrace the litigation. Id. at 1349-50. Second, if managers disagree with the shareholder's concerns, the demand requirement provides the board with an opportunity to reject the demand and, if necessary, seek early dismissal of the suit. Id. at 1350.
Most jurisdictions will excuse demand if the shareholder can establish that making it would be futile. Id. at 1351. New Jersey recognizes the demand-futility doctrine. In re Prudential Ins. Co. Litig., 282 N.J.Super. 256, 275, 659 A.2d 961 (Ch.Div.1995). Our procedures are codified under Rule 4:32-5, which states, in part:
In an action brought to enforce a secondary right on the part of one or more shareholders in an association, incorporated or unincorporated, because the association refuses to enforce rights which may properly be asserted by it, the complaint shall be verified and allege that the plaintiff was a shareholder at the time of the transaction complained of, or that the share thereafter devolved by operation of law. The complaint shall also set forth with particularity the efforts *308 of the plaintiff to secure from the managing directors or trustees and, if necessary, from the shareholders such action as is desired, and the reasons for the failure to obtain such action or the reasons for not making such effort.

[(Emphasis added).]
See also In re Midlantic Corp. Shareholder Litig., 758 F.Supp. 226, 239 (D.N.J. 1990) (noting that plaintiff is required to make demand under Rule 4:32-5 unless excused from doing so under state law).
Until today, this Court has not had the occasion to formulate or apply a standard for evaluating demand futility actions under Rule 4:32-5. One prior case, Escoett v. Aldecress Country Club, 16 N.J. 438, 109 A.2d 277 (1954), touched on that issue from the perspective of a demand made on a general body of stockholders under R.R. 4:36-2, the predecessor to Rule 4:32-5. Escoett, however, did not address the issue of when demand should be excused within the context of a board of directors. Although this Court has not spoken directly to the issue, the Chancery Division in Prudential, supra, adopted a two-part test to be applied in such circumstances. 282 N.J.Super. at 275, 659 A.2d 961. The test is derived from a standard articulated by the Delaware Supreme Court in Aronson v. Lewis, 473 A.2d 805 (1984), overruled on other grounds, Brehm v. Eisner, 746 A.2d 244 (Del.2000).
Under Aronson, a trial court must decide "whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." Aronson, supra, 473 A.2d at 814. Notwithstanding Aronson's use of "and" in its test, the Delaware Supreme Court in Brehm, supra, clarified that "[t]hese prongs are in the disjunctive. Therefore, if either prong is satisfied, demand is excused." 746 A.2d at 256 (footnote omitted).
Prudential provides a good illustration of these concepts. In that case, Prudential Insurance Company (Prudential) acquired Bache Group, renaming it Prudential Securities, Inc. (PSI). Prudential, supra, 282 N.J.Super. at 263, 659 A.2d 961. The acquired entity specialized in retail brokerage and "embarked on an aggressive campaign to increase revenue by selling a package of investment products." Id. at 264, 659 A.2d 961. As part of its campaign, PSI "marketed approximately $8 billion in limited partnership interests and other direct investments throughout the United States." Ibid. The marketing operation, known as the "Limited Partnership Program," included "offerings purportedly consist[ing] of illiquid and highly speculative partnerships in oil and gas investments, real estate, aircraft leasing, and horse breeding." Ibid. Although Prudential terminated its investments in oil and gas partnerships because it had considered them poor risks, "PSI continued to promote energy partnerships as sound investments." Ibid.
The Securities and Exchange Commission (SEC) investigated PSI's Limited Partnership Program and "found that PSI had committed extensive securities fraud violations in conjunction with its marketing and sale of limited partnership interests, including misrepresenting speculative, illiquid limited partnerships as safe, income-producing investments." Id. at 265, 659 A.2d 961. At about the same time, PSI became the subject of "thousands of legal proceedings brought by investors in the limited partnership seeking recoveries of the amounts paid and/or compensatory damages." Id. at 264, 659 A.2d 961. PSI incurred significant liabilities. The SEC fined PSI $10 million, various states assessed *309 it $26 million in penalties for violations of state securities laws, and the National Association of Securities Dealers fined it $5 million for industry rule violations. Id. at 265, 659 A.2d 961.
On those facts, two policyholders of Prudential filed a derivative suit against the executives of PSI and Prudential, the Prudential board of directors, and Prudential itself. Id. at 260-61, 659 A.2d 961. Their complaint alleged breach of fiduciary duty; waste, mismanagement, and gross negligence; intentional misrepresentation; and negligent misrepresentation. Id. at 261, 659 A.2d 961. The plaintiffs did not make a demand on Prudential's board of directors before filing suit. Id. at 262, 659 A.2d 961. Accordingly, the defendants moved to dismiss the derivative claims pursuant to Rule 4:32-5. Ibid.
Applying the two-prong Aronson test, the Prudential court ruled in favor of defendants, holding that the plaintiffs had "failed to plead with the particularity required by R. 4:32-5 why demand should be excused." Id. at 285, 659 A.2d 961. As to the first prong, the court found that the plaintiffs' allegations that the directors were "not disinterested or independent and that they [were] controlled by the `defendants at the heart of the wrongdoing[,]'" were mere "conclusory allegations[.]" Id. at 277, 659 A.2d 961. As such, they were insufficient to excuse demand. Ibid. The court further noted that the plaintiffs' complaint did not differentiate among directors and other defendants, nor did it "plead any facts showing that past directors had actual knowledge of the alleged wrongdoings at the time that they were committed." Ibid.
The court also rejected the plaintiffs' claim that the defendants were "self-interested because they [did] not want to sue themselves, their friends and their business associates." Id. at 278, 659 A.2d 961.
The court observed:
"[T]he incantation that demand is excused because the directors otherwise would have to sue themselves [is a] bootstrap argument [which] has been made to and dismissed by other courts.... Its acceptance would ... weaken the managerial power of directors. Unless facts are alleged with particularity to overcome the presumptions of independence and a proper exercise of business judgment, in which case the directors could not be expected to sue themselves, a bare claim of this sort raises no legally cognizable issue."
[Ibid. (quoting Aronson, supra, 473 A.2d at 818).]
Applying the second prong, the court distinguished between action and inaction, explaining that "`the absence of board action... makes it impossible to perform the essential inquiry contemplated by Aronson, whether the directors have acted in conformity with the business judgment rule in approving the challenged transaction.' " Id. at 283, 659 A.2d 961 (quoting Rales v. Blasband, 634 A.2d 927, 933 (Del. 1993)). The court determined that plaintiffs' complaint focused largely on director inaction, namely, the failure of the Prudential directors "to supervise a subsidiary" and "more generally, to stop the alleged illegal actions of the executive defendants[.]" Id. at 284, 659 A.2d 961. As a result, the court concluded that no further analysis under Aronson's second prong was required. Id. at 285, 659 A.2d 961. See also Aronson, supra, 473 A.2d at 813 (explaining that business judgment rule "has no role where directors have either abdicated their functions, or absent a conscious decision, failed to act"); Rales, supra, 634 A.2d at 933-34 (observing in essence that Aronson's second prong does not apply "where the board that would be *310 considering the demand did not make a business decision which is being challenged in the derivative suit").
We are satisfied that the Aronson two-prong inquiry, as illustrated in In re Prudential, represents the appropriate standard for evaluating demand futility. The test strikes the appropriate balance between director autonomy and the interests of shareholders in this context. See Pachman, supra, at 219-222 (discussing respective rights of directors and shareholders under New Jersey law). Accordingly, for shareholder plaintiffs in New Jersey to withstand a motion to dismiss for failure to make a demand, they must plead with particularity facts creating a reasonable doubt that: (1) the directors are disinterested and independent, or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. If either prong is satisfied, demand will be excused under Rule 4:32-5.

C.
Delaware law also permits a corporation's board to seek dismissal of a derivative suit in a demand-excused context. Zapata Corp. v. Maldonado, 430 A.2d 779, 789 (Del.1981). In such demand-excused cases, the board may appoint a special litigation committee to investigate whether the suit is in the best interest of the corporation. Id. at 786. Numerous jurisdictions emulate Delaware's approach. Ferrell, supra, 60 Ohio St. L.J. at 249-50. Based on the committee's findings, the corporation may move for dismissal of the suit, although the corporation has the burden of proving the "independence," "good faith," and "reasonableness" of the committee's investigation. Zapata, supra, 430 A.2d at 788. When circumstances warrant, boards also might rely on special litigation committees in demand-made cases to determine whether a suit should proceed in response to a shareholder's demand. PSE & G, supra, 315 N.J.Super. at 329, 718 A.2d 254; Pachman, supra, at 94.
This case does not implicate a special litigation committee because defendants did not create one to evaluate the shareholders' claims. That said, we find nothing in the New Jersey Business Corporation Act, N.J.S.A. 14A:1-1 to 14A:17-18, that would preclude the use of a special litigation committee in this setting. We are not required in this appeal to consider a board's limitations, if any, on its establishment and use of a special litigation committee. See Houle v. Low, 407 Mass. 810, 556 N.E.2d 51, 54, 57 (1990) (surveying varying judicial decisions on use of special litigation committees). For today's purposes it is sufficient for us to state that, as a general framework for analysis, we will "not differentiate between cases where a shareholder litigation committee investigated the demand and cases in which demand was refused by the board." PSE & G, supra, 315 N.J.Super. at 329 n. 1, 718 A.2d 254.

D.
Whether or not demand is excused, the issue becomes what level of judicial scrutiny should be applied when reviewing management's response to shareholder-derivative litigation. Courts generally apply the traditional business judgment rule or one of many variations of the rule in evaluating a board's response. Ferrell, supra, 60 Ohio St. L.J. at 251 n. 36 (stating that "[t]here are at least five different standards presently being applied by various jurisdictions across the country"). We agree with those courts that apply a single standard of review in both demand-made and demand-excused cases. See, e.g., Alford v. Shaw, 320 N.C. 465, 358 S.E.2d 323, 327 (1987) (drawing no distinction "between demand-excused and other types of *311 cases" for purposes of judicial review); Lewis v. Boyd, 838 S.W.2d 215, 224 (Tenn. Ct.App.1992) (observing that "depth of review should not depend on whether or not the shareholder made a demand prior to filing suit").
The seminal case that exemplifies the deferential or traditional approach is Auerbach v. Bennett, 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979). In Auerbach, a shareholder commenced a derivative action following a report by an audit committee of General Telephone & Electronics Corporation (GT & EC) that disclosed more than $11 million in illegal bribes paid by GT & EC to third parties. Id. at 624-25, 419 N.Y.S.2d 920, 393 N.E.2d 994. The shareholder plaintiffs named four of the thirteen corporate directors as the defendants. Id. at 625 n. 2, 419 N.Y.S.2d 920, 393 N.E.2d 994. In response, the corporation created a special litigation committee consisting of three disinterested directors who did not sit on the board at the time that the alleged transactions occurred. Id. at 625, 419 N.Y.S.2d 920, 393 N.E.2d 994.
The committee's examination revealed that the audit conformed to accepted auditing standards. Ibid. Further, the committee concluded that none of the individual directors violated New York's statutory standard of care or profited personally by the alleged acts. Ibid. The committee determined that it would not be in the best interest of the corporation for the derivative action to proceed and directed the corporation's general counsel to assert that position in the then-pending litigation. Id. at 626, 419 N.Y.S.2d 920, 393 N.E.2d 994. As a result, the corporation and the individual defendants moved to dismiss the plaintiff's action. Ibid.
New York's highest court considered whether to apply the business judgment rule when evaluating the decision of a special litigation committee. Id. at 629, 419 N.Y.S.2d 920, 393 N.E.2d 994. The court determined that its inquiry should be limited to an examination of the committee's independence and the sufficiency of its procedures. Id. at 623-24, 419 N.Y.S.2d 920, 393 N.E.2d 994. It further emphasized that "[w]hile the court may properly inquire as to the adequacy and appropriateness of the committee's investigative procedures and methodologies, it may not under the guise of consideration of such factors trespass in the domain of business judgment." Id. at 634, 419 N.Y.S.2d 920, 393 N.E.2d 994.
Courts in other jurisdictions follow the Auerbach approach. Genzer v. Cunningham, 498 F.Supp. 682, 686-89 (E.D.Mich. 1980); Will v. Engebretson & Co., 213 Cal.App.3d 1033, 261 Cal.Rptr. 868, 872-73 (1989); Black v. NuAire, Inc., 426 N.W. 2d 203, 209-10 (Minn.Ct.App.1988). Essentially, those courts treat management's decision to reject a shareholder suit similar to the treatment of other business decisions. Swanson, supra, 77 Minn. L.Rev. at 1363. That traditional approach has been applauded in some quarters because it recognizes that courts are not equipped to handle sophisticated corporate decision making. Kelly M. Crain, Comment, Decisions of Special Litigation Committees: Solving the Problem of Control Under Texas Law, 44 Baylor L.Rev. 171, 180 (1992). It also preserves corporate autonomy to the greatest extent possible. Swanson, supra, 77 Minn. L.Rev. at 1359-60.
Notwithstanding those asserted benefits, the traditional approach is not without its critics. Some consider the rule extremely deferential to directors, making it difficult for shareholders to maintain a derivative suit due to discovery limitations and their general inability to obtain facts necessary to overturn a board's decision. Id. at *312 1364; Crain, supra, 44 Baylor L.Rev. at 181. Responding to those criticisms, the trial court in this case eschewed the traditional approach. PSE & G, supra, 315 N.J.Super. at 335, 718 A.2d 254. The court explained that "[r]equiring shareholders to allege facts with specificity without discovery places them in a position bordering on the impossible." Ibid. The court cited other jurisdictions that have concluded similarly that Auerbach accords too much deference to a board of directors or its special litigation committee in evaluating derivative litigation. Id. at 330-31, 718 A.2d 254 (citing Alford, supra, 358 S.E.2d at 326; Houle, supra, 556 N.E. 2d at 58-59; Lewis, supra, 838 S.W.2d at 224).
We believe that the trial court correctly declined to apply the traditional business judgment rule in this case. Instead, we shall apply a modified business judgment rule that imposes an initial burden on a corporation to demonstrate that in deciding to reject or terminate a shareholder's suit the members of the board (1) were independent and disinterested, (2) acted in good faith and with due care in their investigation of the shareholder's allegations, and that (3) the board's decision was reasonable. PSE & G, supra, 315 N.J.Super. at 335, 718 A.2d 254. All three elements must be satisfied. Moreover, shareholders in these circumstances must be permitted access to corporate documents and other discovery "limited to the narrow issue of what steps the directors took to inform themselves of the shareholder demand and the reasonableness of its decision." Id. at 337, 718 A.2d 254.
As the trial court more fully explained:
The adoption of a modified business judgment rule, the key feature being that the corporation, not the shareholder, would have to meet an initial burden of proof is more consistent with the realities of shareholder-corporate existence. Courts would have to dismiss a shareholder derivative suit in accordance with management's recommendation so long as the corporation could establish the decision maker acted reasonably, in good faith, and in a disinterested fashion. The [ ] standard would not permit the court to substitute its own business judgment for that of management. In determining whether the corporation has met its burden, the court would be able to consider all relevant justifications for management's determination, including the seriousness and weight of the plaintiff's allegations.
[Id. at 336, 718 A.2d 254.]
There are differences and similarities between the test for determining demand-futility under Rule 4:32-5 and the standard for evaluating a board's decision under the modified business judgment rule. The main distinction is that a plaintiff has the burden of demonstrating demand-futility, whereas a defendant has the burden of satisfying the elements of the modified business judgment rule. Further, when a court decides a defendant's motion to dismiss a shareholder's suit for failure to make a demand as required under Rule 4:32-5, the court's review is generally limited to the pleadings. Prudential, supra, 282 N.J.Super. at 267, 659 A.2d 961. In contrast, under the modified business judgment rule, a plaintiff is entitled to a degree of discovery prior to a court's ruling on whether a corporation properly has determined to reject or terminate the litigation.
When a court evaluates demand-futility, "[p]laintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences." Brehm, supra, 746 *313 A.2d at 255; accord, Prudential, 282 N.J.Super. at 276-78, 659 A.2d 961. If the court denies a Rule 4:32-5 motion and relieves a shareholder of the demand requirement, a defendant may later renew its motion to dismiss the litigation, as was done here. At that juncture, however, the court would evaluate the motion by applying the burden-shifting and other aspects of the modified business judgment rule.
We also make clear that an appellate court's review of a trial court's decision under either Rule 4:32-5 or the modified business judgment rule is de novo on the record. Along those lines, we agree with the Supreme Court of Delaware that stated recently in a case involving whether a group of shareholders had alleged sufficient facts to excuse demand:
Our review is not a deferential review that requires us to find an abuse of discretion. We see no reason to perpetuate the concept of discretion in this context. The nature of our analysis of a complaint in a derivative suit is the same as that applied by the Court of Chancery in making its decision in the first instance.

[Brehm, supra, 746 A.2d at 253.]
The test under Rule 4:32-5 and the modified business judgment rule are similar in that they both implicate whether directors are disinterested and independent. Notwithstanding that similarity, a court applying the modified business judgment rule is not bound by any finding associated with an earlier court's decision to excuse demand. See Hart v. City of Jersey City, 308 N.J.Super. 487, 497-98, 706 A.2d 256 (App.Div.1998) (outlining circumstances to permit second judge on same level as first judge to differ with earlier ruling without violating "law of the case" doctrine). In that respect, the court should consider the board's decision under the modified business judgment rule only after the parties have completed adequate discovery to enable the court to render a fully-informed decision.
For completeness, we note that some commentators have proposed repealing the demand-futility doctrine, arguing that it requires courts to "engag[e] in a tortured inquiry of whether demand is excused." PSE & G, supra, 315 N.J.Super. at 334, 718 A.2d 254. In its place, they would require a universal-demand requirement, coupled with a standard of review similar to the modified business judgment rule adopted here. Swanson, supra, 77 Minn. L.Rev. at 1387-90. In our view, the demand-futility doctrine retains its usefulness for that narrow group of cases in which the pleadings alone clearly provide a basis for a court's disposition.
More broadly, we are satisfied that the demand-futility doctrine and the modified business judgment rule each serve a discrete but critical function. That is especially so in a case in which a trial court first excuses demand and then later applies the modified business judgment rule to evaluate a board's ultimate response to the litigation. The practical reality is that in many cases a shareholder will want to make a demand on the board to avoid the burden of demonstrating demand-futility. Given the salutary purposes of the demand requirement, that practical reality convinces us that our approach is proper. It preserves the most useful elements of Rule 4:32-5 while advancing an overarching standard to guide judicial review.
We are also mindful that some scholars have urged courts to adopt a more intrusive standard of review than the one articulated here. See, e.g., Cox, supra, 1982 Duke L.J. at 1008 (proposing that "court should use its own independent judgment to determine whether dismissal [of derivative suit] would be in the corporation's best *314 interest[, and] ... court should make its decision after an adversarial proceeding") (footnote omitted). We decline to go that far. Our standard places a burden on directors to justify their responses as provided above, and it permits shareholders to obtain certain documents and other forms of discovery. In that respect, it is less deferential than the traditional approach, yet it still embodies the fundamental principle that corporate governance should remain in the hands of those directors who act in good faith and in a reasonably informed, disinterested manner.
We also emphasize that the thrust of plaintiffs' allegations is that defendants mismanaged the company and breached their duty of care. We reserve for another day what the appropriate standard might be if faced with a complaint accusing directors of more serious conduct, such as self-dealing, fraud, or similar bad acts. We acknowledge that corporate executives may engage in egregious, even criminal conduct. For now, however, we need only design and apply an analytical framework within which to evaluate the Board's response to the allegations presented in the case before us.

III.

A.
Our first inquiry under the modified business judgment rule is whether defendants have satisfied their burden of showing that the Board was "disinterested" and "independent" when it decided to terminate the litigation. In that context, "[d]irectorial interest exists when divided loyalties are present, or where the director stands to receive a personal financial gain from the transaction not equally shared by the shareholders." Prudential, supra, 282 N.J.Super. at 276, 659 A.2d 961. "Directorial independence `means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous consideration or influences.'" Ibid. (quoting Aronson, supra, 473 A.2d at 816). A director is not to be viewed as being "interested" merely because he or she may have approved the challenged transaction or because a shareholder alleges that the director would be reluctant to sue a fellow corporate decision-maker. Prudential, supra, 282 N.J.Super. at 276, 659 A.2d 961.
We do not find that Stricklin conceded the independence and disinterestedness of the Board when she initially demanded that the company act. In that respect, we disagree with those courts that have suggested that "by making a demand the stockholder `tacitly acknowledges the absence of facts to support a finding of futility.'" Coyer v. Hemmer, 901 F.Supp. 872, 886 (D.N.J.1995) (quoting Spiegel v. Buntrock, 571 A.2d 767, 774-75 (Del. 1990)). Just as a subsequent court is not bound to an earlier court's evaluation of board disinterestedness in the demand-futility context, supra, at 313, we will not presume in a demand-made case that a board is disinterested and independent. Rather, we will hold the company to its proofs.
In doing so here, we agree with the trial court that defendants have presented "undisputed evidence which proves that the directors were in fact disinterested and independent when they decided to reject the demand and terminate this litigation." In individual depositions or certifications, directors testified that their decision to reject the demand and terminate the suit was based on factors relating to the best interest of the corporation and not on extraneous considerations. The Appellate Division correctly summarized their statements:

*315 [T.J. Dermot] Dunphy stated that he voted to reject the demand and terminate the litigation based on the Kasowitz reports, [Harold G.] Levison's presentation [Levison served as the firm's lead counsel] and the limitation of liability provision. He said that he believed mistakes were made, but that the board had sufficient information for its oversight role. Dunphy believed there was no violation of the business judgment rule and no gross negligence. [Irwin] Lerner stated that he voted to reject the demand and to terminate the litigation because the board members were highly competent and active in the affairs of the nuclear facilities. [Marilyn M.] Pfaltz stated that she voted to reject the demand and to terminate the litigation because the board was always fully informed and because she did not believe there was any merit to the allegations. [James C.] Pitney said that he voted to reject the demand and to terminate the litigation because of the independence and strength of the board (the "strongest" board he has ever been associated with), and based on the Kasowitz reports. [Josh S.] Weston stated that he voted to reject the demand and to terminate the litigation because the board had continually been furnished with accurate and adequate information; the board had a great deal of experience and knowledge; there was at least one member of the board with nuclear experience at all times; the board held frequent meetings and engaged in proper oversight of the nuclear operations; and the board was willing to pay above average salaries to its officers. [E. James] Ferland voted to reject the demand and to terminate the litigation based on the Kasowitz reports, the quality of the people on the board, independent assessments provided the board during the relevant time period, and a reluctance to sue the officers in question. [Lawrence R.] Codey voted to reject the demand and to terminate the litigation based on the quality of the people on the board, the quality and quantity of the information addressed during the board meetings, the board's openness to meeting with outside people, and the Kasowitz reports.
We find no persuasive evidence to contradict that testimony. More specifically, there is nothing in the record to convince us that the directors had divided loyalties, stood to receive any improper personal gain, or were unduly influenced by any improper motive. Under those circumstances, we agree with the trial court's conclusion that "plaintiffs have present[ed] no evidence rebutting any aspect of any director's testimony as to why any director voted to terminate the litigation." Defendants have thus satisfied the first element of the modified business judgment rule.

B.
Our next inquiry focuses on whether the Board acted in good faith and with due care in investigating the merits of the litigation. Preliminarily, we echo the trial court's observation that "the court's inquiry is not into the substantive decision of the board, but rather is into the procedures employed by the board in making its determination." In that regard, there is "no prescribed procedure that a board must follow." Levine v. Smith, 591 A.2d 194, 214 (Del.1991), overruled on other grounds, Brehm, supra, 746 A.2d 244. Nonetheless, the process should be such that a reviewing court can look to it and conclude confidently that it reflects a corporation's earnest attempt to investigate a shareholder's complaint. Stated differently, the inquiry is whether the "investigation has been so restricted in scope, so shallow in execution, or otherwise so pro *316 forma or half hearted as to constitute a pretext or sham[.]" Stoner v. Walsh, 772 F.Supp. 790, 806 (S.D.N.Y.1991) (internal quotation marks and citation omitted).
Plaintiffs question the fact that the Board on its own behalf (rather than on behalf of the company) retained a law firm to investigate the litigation, and they question the selection of the Kasowitz firm itself. In our view, neither action indicates bad faith or invalidates the Board's decision to terminate the litigation. One of a board's prerogatives in this context is "to entrust its investigation to a law firm[.]" Stepak v. Addison, 20 F.3d 98, 405 (11th Cir.1994); see also 2 Principles of Corp. Governance, § 7.09(a)(2)(1994) (instructing that shareholder demands should be considered by board of directors with assistance of counsel "of its choice"). We are aware of no facts that would lead us to conclude that the Kasowitz firm had a disabling conflict that would have tainted its investigation. Moreover, as noted by the Appellate Division, the Kasowitz firm was "experienced in nuclear power matters, in shareholder litigation, and independent and uninvolved in other Enterprise matters."
Our concurring colleague incorrectly suggests that we condone all aspects of the Board's decision-making process or the role played by the Kasowitz firm. We do no such thing. Rather, we have reviewed the Board's process through the prism of the modified business judgment rule and agree with the trial court's ultimate disposition. Although the Kasowitz firm needlessly risked creating a conflict by briefly assuming a dual role as the Board's investigator and litigation counsel, the critical question is whether defendants demonstrated bad faith or acted unreasonably in relying on that firm's investigation. For the reasons expressed throughout this opinion, we conclude that they did not.
As for the investigation itself, we cannot improve on the trial court's summary of it. That court stated:
Immediately upon its retention by the board on October 17, 1995, the Kasowitz firm began its investigation which continued into the middle of March 1996. The record before the court reflects that fourteen attorneys and five legal assistants from the Kasowitz firm spent approximately 4,500 hours on the investigation, approximately one quarter of which was attributable to partners of the Kasowitz firm.
The Kasowitz firm made numerous, specific written and oral requests to Enterprise for relevant documents which resulted in Enterprise producing approximately 43,000 pages of documentation. The Kasowitz firm requested and received voluminous documentation relating to board-level involvement with nuclear operations, including the minutes and attachments to the minutes from the meetings of: (a) the Enterprise board of directors (as those meetings related to nuclear operations); (b) the Nuclear Committee of the Enterprise board; (c) the Enterprise Nuclear Review Board; and (d) the Enterprise Nuclear Oversight Committee. The Kasowitz firm requested and received extensive documentation relating to the review of nuclear operations by the NRC including: (a) NRC Systematic Assessment of Licensee Performance reports evaluating Enterprise's nuclear facilities; (b) NRC Notices of Violations and Enterprise's responses thereto; (c) NRC Augmented Inspection Team reports concerning events at Enterprise's nuclear facilities; (d) NRC Special Inspection Team reports concerning inspections at Enterprise's nuclear facilities; and (e) NRC Monthly Inspection Reports of Enterprise's nuclear facilities.

*317 The Kasowitz firm requested and received voluminous documentation prepared by INPO, including INPO evaluations of Enterprise's nuclear facilities and Enterprise's responses thereto[.] In addition to all of this documentation, the Kasowitz firm requested and received the following voluminous documentation relating to Enterprise's nuclear operations: (a) proceedings before the New Jersey Board of Public Utilities (the principal state regulator of Enterprise's nuclear facilities); (b) Enterprise's Significant Event Response Team (internal investigation teams convened following significant events at the nuclear facilities to determine the root causes of the events) reports; (c) Enterprise's Licensee Event Reports (reports submitted to the NRC by licensee concerning events that occur in violation of a plant's technical specifications); and (d) Quality Assurance/Nuclear Safety Review (an internal department) monthly reports.
Moreover, in addition to the documentation referred to above, the Kasowitz firm requested and received voluminous documentation concerning specific events referenced in plaintiffs' complaints, including the (a) May 25, 1993 Rod Control Event; (b) April 7, 1994 Marsh Grass Event; (c) April 5, 1995 Hope Creek Radiological Release event; (d) June 6, 1995 Residual Heat Removal System Event; and (e) July 8, 1995 Hope Creek Shutdown Cooling Partial Bypass Event.
The undisputed evidence is that Enterprise dedicated extensive resources to review the Kasowitz firm's requests for documents and to compile and produce responsive documentation. For example, at Enterprise's nuclear facilities located at Artificial Island, New Jersey, Enterprise dedicated Mr. Ross J. Bell, a business specialist in the External Affairs Group of PSE & G's Nuclear Business Unit; Mr. Bryan Gorman, a senior staff employee in the Nuclear Business Unit; and Mr. Dennis Lougeay, an outside consultant to gather the documents requested by the Kasowitz firm, with Mr. Bell dedicating "50 to 75 percent of [his] time" to the document production. In addition, at Enterprise's Newark, New Jersey headquarters, Enterprise dedicated several individuals to provide documents responsive to the Kasowitz firm's requests, including Mr. Edward J. Biggins, Jr., Enterprise's Corporate Secretary, Mr. R. Edwin Selover, Enterprise's General Counsel and Mr. William E. Frese, Enterprise's General Litigation Counsel.
The Kasowitz firm interviewed dozens of witnesses in connection with its investigation. For example, the February Report prepared by the Kasowitz firm states that:
We have also conducted over thirty interviews, including interviews of present and former directors, officers, and employees of Enterprise and its subsidiaries, in connection with our investigation. We selected for interviews those persons most likely to have knowledge about the management of [PSE & G's] nuclear operations, and about certain specific events examined during our investigation. (February Report at 3.)
Similarly, the March Report notes that in connection with the preparation of that report, the Kasowitz firm "conducted further interviews of PSE & G officers and employees." (March Report at 13.)
The Kasowitz firm interviewed each of the Enterprise directors and among others, Leon Eliason (Chief Nuclear Officer), Clay Warren (General Manager of the Salem facilities), Stanley LaBruna *318 (Vice President of Nuclear Engineering), Dr. Shirley Jackson (former member of the Enterprise board of directors, former chair of Enterprise's Nuclear Oversight Committee and Enterprise's Nuclear Committee, and, at the time of the investigation, Chairperson of the United States Nuclear Regulatory Commission), Robert Dougherty (Senior Vice President of the Electrical Business Unit), and Steven E. Miltenberger (former Vice President and Chief Nuclear Officer).
Based on the procedures employed and the seriousness by which the Kasowitz firm approached its task, we are satisfied that defendants have satisfied their burden of demonstrating that they acted in good faith and with due care in evaluating the litigation.

C.
The final inquiry is whether defendants have satisfied their burden of demonstrating that the Board's decision to terminate the litigation was reasonable. In resolving that question, we "consider all relevant justifications for management's determination, including the seriousness and weight of the plaintiff[s'] allegations." PSE & G, supra, 315 N.J.Super. at 336, 718 A.2d 254. Within that framework, the Appellate Division concluded:
The Kasowitz investigation was most thorough and the record is convincing that the directors and officers were well aware of the nuclear problems, devoted ample attention to them, and did not recklessly or grossly neglect their duties, or manifest disloyalty to the company. The directors were entitled to weigh and evaluate the chances of economic success of the derivative action, given the very high standards of proof required by the business judgment rule and the limitation of liability exculpatory standards, against the financial costs of defending the suit, and the intangible costs which included the distractions and disruptions to management and operational personnel anticipated from complex litigation.
We agree substantially with the Appellate Division. By virtue of the procedures that it employed, the Board informed itself of the substance of the shareholders' allegations and weighed those allegations against the likelihood that the litigation would succeed. The Board's judgment is reflected in its March 19, 1996, resolution, which states that "any such litigation would not be meritorious, would constitute a wasting of assets and diversion of management resources of this Corporation, and would result in a loss of morale and unwarranted unfavorable publicity, with little likelihood of success[.]"
As previously mentioned, in deciding to terminate the litigation, the directors relied on a provision in the company's certificate of incorporation that provides that directors and officers "shall not be personally liable to the corporation or its shareholders" for "breach of any duty owed to the corporation or its shareholders." That provision is based on N.J.S.A. 14A:2-7(3), which was enacted in 1987 and amended in 1989. The statute states:
The certificate of incorporation may provide that a director or officer shall not be personally liable, or shall be liable only to the extent therein provided, to the corporation or its shareholders for damages for breach of any duty owed to the corporation or its shareholders, except that such provision shall not relieve a director or officer from liability for any breach of duty based upon an act or omission (a) in breach of such person's duty of loyalty to the corporation or its shareholders, (b) not in good faith or involving a knowing violation of law or *319 (c) resulting in receipt by such person of an improper personal benefit. As used in this subsection, an act or omission in breach of a person's duty of loyalty means an act or omission which that person knows or believes to be contrary to the best interests of the corporation or its shareholders in connection with a matter in which he has a material conflict of interest.

[N.J.S.A. 14A:2-7(3).]
The respective bill statements that accompanied the statute and its subsequent amendment are illuminating. The statement to the 1987 enactment provides, in part:
The proposed changes will permit directors and officers to be protected against liability for damages to the corporation or its shareholders unless they have been guilty of breach of loyalty, bad faith or a knowing violation of law or through a breach of duty have received an improper personal benefit.
[Senate Labor, Industry, and Professions Committee, Statement to Senate Bill No. 2510, reprinted in N.J.S.A. 14A:2-7.]
The statement accompanying the 1989 amendment states, in part:
One of the breaches of duty for which a director or officer cannot be protected against under P.L.1987, c. 35 is an act or omission "in breach of such person's duty of loyalty to the corporation or its shareholders." This bill defines such act or omission as one which that person knows or believes to be contrary to the best interests of the corporation or its shareholders in connection with a matter in which he has a material conflict of interest. This definition will prevent plaintiffs in shareholder suits from getting around the statute by characterizing actions or omissions which are normally considered negligence as breaches of the duty of loyalty.

[Senate Labor, Industry and Professions Committee, Statement to Senate Bill No. 2673 (emphasis added), reprinted in N.J.S.A. 14A:2-7.]
Plaintiffs contend that shareholders amended the company's charter in 1987 to include the limitation of liability provision without being informed of alleged mismanagement of the board members then serving. They further assert that the provision cannot protect defendants from what plaintiffs allege were acts of recklessness and bad faith. In our view, the record demonstrates no recklessness, gross neglect of duties, or manifest disloyalty to the company by defendants. Moreover, for today's purposes we do not have to engage in a lengthy discussion of the process by which the shareholders adopted the limitation of liability provision. The relevant inquiry under the modified business judgment rule is whether the directors reasonably relied on that provision in deciding to terminate the litigation.
Apart from mere conclusory allegations, the gist of plaintiffs' complaint is that defendants breached their duty of care as opposed to the more serious duty of loyalty. Given the straightforward language of N.J.S.A. 14A:2-7(3), as amplified by the two bill statements quoted above, the Kasowitz firm informed the Board that the limitation of liability provision would apply in these circumstances. We conclude that it was reasonable for the Board to rely on that advice in evaluating plaintiffs' allegations. In sum, we are satisfied that the Board's judgment was reasonable under the totality of the circumstances, and that the Board acted consistent with the principles articulated in this opinion when relying on the Kasowitz investigation to guide its decision.

*320 D.
To recap: Defendants have carried their burden under the modified business judgment rule, including the burden of demonstrating their independence in deciding to terminate the litigation. We fully appreciate the distinction between that legal standard and complete impartiality in the everyday sense of the word. Directors understandably are not likely to be enthusiastic about approving the prosecution of a shareholder's suit against members of management with whom the directors maintain an ongoing relationship. Moreover, the Court is well aware of the questions now being raised in the broader marketplace about the objectivity and responsibility of corporate directors.
We have approached this case with those considerations in mind. In undertaking a scrupulous and painstaking de novo examination of the record, we are satisfied that defendants have acted reasonably, in good faith, and in a disinterested fashion in deciding to terminate the litigation. There are no issues for a jury to resolve. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). To the extent that we have not specifically addressed issues or arguments advanced by plaintiffs, we deem them to be without sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E). For the reasons already expressed, the trial court correctly granted summary judgment in favor of defendants.

IV.
The judgment of the Appellate Division is affirmed.
STEIN, J., concurring.
I join in the Court's thoughtful and well-reasoned disposition of this appeal. I especially endorse the Court's determination that trial and appellate courts, in reviewing under the modified business judgment rule a Board of Directors' decision not to maintain a directive shareholders' suit, must conduct that review de novo on the record. Ante at 313. That inquiry, as the Court emphasizes, requires a higher level of scrutiny than would be necessary under an "abuse of discretion" standard. Ibid. The de novo standard requires the reviewing court to satisfy itself, based on the record, that the members of the board were independent and disinterested, that they acted in good faith and with due care in their investigation, and that their decision to dismiss the suit was a reasonable one. Ante at 312-13.
Although I agree with the standard of review adopted by the Court, I consider it appropriate to remind trial and appellate courts that a heavy dose of pragmatism is indispensable in reviewing the reasonableness of a Board's decision to terminate derivative shareholder litigation. Notwithstanding our prior conclusion, ante at 314-15, that these directors satisfied the legal standard for independence in deciding to terminate the litigation, courts should fully appreciate the distinction between that tolerant legal standard and complete impartiality. As the Court observes, ante at 320, "[d]irectors understandably are not likely to be enthusiastic about approving the prosecution of a derivative stockholder's suit against members of management with whom the Directors maintain an ongoing relationship," especially when members of management initially may have recommended appointment of one or more members of the Board. As one commentator observed: "Structural bias is an attitude that attaches to a directorship and rests on cultural ties that antedate the director's election or appointment, which combine to draw the directors to the defendants' side." James D. Cox, Searching for the Corporation's Voice in Derivative *321 Suit Litigation: A Critique of Zapata and the ALI Project, 1982 Duke L.J. 959, 1010.
Moreover, we note that the recent disclosures of flagrant irregularities in corporate financial statements has focused renewed attention on the objectivity and responsibility of corporate directors. See Cleaning Up the Boardroom, N.Y. Times, Mar. 8, 2002, at A20 ("One of the most important lessons of Enron is the havoc that can result when oversight by corporate boards of directors breaks down.") Accordingly, the exercise of de novo review by trial and appellate courts of the reasonableness of a corporate board's decision to terminate stockholder derivative litigation should be conducted with a realistic awareness that only a scrupulous and painstaking examination of the record will be sufficient to assure the court that the board's discretion has been exercised reasonably and responsibly.
I also must record my concern with the following observation by the Court: "We are aware of no facts that would lead us to conclude that the Kasowitz firm had a disabling conflict that would have tainted its investigation." Ante at 316. Although my concern does not lead me to a different result, I believe that the Court should not so readily excuse the overlapping and inconsistent roles exercised by the Kasowitz law firm, with the Board's concurrence.
The record reveals that on October 17, 1995 the Board adopted a resolution authorizing the retention of the Kasowitz firm to investigate the allegations asserted in the Stricklin demand. The Stricklin complaint was filed on December 27, 1995. The Kasowitz firm submitted its one hundred twenty-four page report to the Board on February 8, 1996.
However, in January 1996, before its report was completed, an attorney at the Kasowitz firm determined that the firm would, on behalf of the Board, request an extension of time to respond to the complaint. One of the Board members testified to his understanding that the Kasowitz firm was authorized on January 16, 1996 to represent the Board in the ensuing litigation. On February 13, 1996, five days after the report was submitted, a stipulation was entered into extending defendants' time to answer the complaint, and the Kasowitz firm was designated as counsel to the director defendants.
However short its duration, the conflict of interest between the role of the Kasowitz firm as the Board's independent investigator, and its role as the Board's litigation counsel in a suit that would implicate the reasonableness of the Boards' decision to terminate the litigation, is too obvious for debate. Whatever redundancy or expense might have resulted, the Board clearly was obligated to retain independent litigation counsel that was not involved in the investigation. In another context, the Eleventh Circuit Court of Appeals in Stepak v. Addison, 20 F.3d 398, 405 (1994), highlighted the potential conflict at issue here:
[W]hen a board chooses to entrust its investigation to a law firmand it is unquestionably the board's prerogative to do sothe directors must ensure that counsel is capable of independently evaluating the corporation's interests. Selection of a law firm that has actually represented the alleged wrongdoers in proceedings related to the very subject matter that the law firm is now asked to neutrally investigate reaches, in our opinion, the level of gross negligence and is incompatible with a board's fiduciary duty to inform itself "of all material information reasonably available" prior to making a business decision.
Because the briefly overlapping roles of the Kasowitz firm did not necessarily render *322 unreasonable the Board's reliance on the investigative report, I would not disturb the Court's affirmance of the conclusion below that the Board acted in good faith and with due care. Nevertheless, in my view the Board's authorization of the dual role of the Kasowitz firm clearly was inappropriate.
For affirmingChief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, and LaVECCHIA6.
OpposedNone.
Justice STEIN filed a separate concurring opinion.