**Kim BAROVIC, et al., derivatively on behalf of Microsoft Corporation, Plaintiffs,**

v.

**Steven A. BALLMER, et al., Defendants.**

**Case No. C14–0540–JCC.**

United States District Court, W.D. Washington, at Seattle.

Signed Dec. 10, 2014.

Brett D. Stecker, Jeffrey J. Ciarlanto, Weiser Law Firm, Berwyn, PA, Kathleen A. Herkenhoff, The Weiser Law Firm PC, San Diego, CA, Duncan Calvert Turner, Badgley Mullins Turner PLLC, Seattle, WA, Katherine Ryan, Richard A. Maniskas, Ryan & Maniskas, LLP, Wayne, PA, for Plaintiffs.

Brendan Thomas Mangan, Stephen M. Rummage, Candice Tewell, Davis Wright Tremaine, Seattle, WA, for Defendants.

## ORDER

JOHN C. COUGHENOUR, District Judge.

This matter comes before the Court on Nominal Defendant Microsoft Corporation's Motion to Dismiss Complaint (Dkt. No. 19) and the Individual Defendants' Motion to Dismiss (Dkt. No. 23). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby DENIES both Motions for the reasons explained herein.

## I. BACKGROUND

In December of 2009, European Union (EU) regulators dropped an antitrust case against Microsoft after nominal Defendant Microsoft Corporation agreed to offer European purchasers of Windows software a choice of several Web browsers, including competitors of Microsoft's Internet Explorer. (Verified Complaint, Dkt. No. 1 at 2.) This agreement, referred to by Plaintiffs as "the Settlement," obligated Microsoft to include "browser choice screens" (BCS) in all Windows updates and new systems for the next five years. (*Id.* at 2, 11; *see also* Individual Defendants' Motion to Dismiss, Dkt. No. 23 at 2.) By stipulating to this Settlement, Microsoft was relieved of both the antitrust suit and avoided EU fines. (Complaint, Dkt. No. 1 at 11.) Pursuant to the terms of the Settlement, Microsoft was directly responsible for monitoring its own compliance with the Settlement during this five-year period. (*Id.*) Neither the Complaint nor any of the documents to which it refers offer in-depth information on the internal mechanisms by which Settlement compliance was monitored, verified, or ensured.

According to Plaintiffs, beginning in February 2011, Defendants ceased complying with the Settlement. (*Id.* at 2.) At this time, Microsoft released at least 15 million installations of Windows 7 in Europe that

lacked the BCS, and on which Internet Explorer was the only web browser, in contravention of the Settlement's terms. (*Id.*)

Although Microsoft was responsible for self-monitoring its compliance with the Settlement, in the summer of 2012, almost a year and a half after the Settlement had first been breached, Microsoft was informed by the EU's antitrust chief, Joaquín Almunia, that the European Commission had received word that some Windows versions available in the EU were lacking the BCS Defendants had committed to include. (*Id.* at 3.) Microsoft offered an apology to Almunia and informed him that the omission was due to a technical error. (*Id.*) Plaintiffs allege that Defendants did not correct the problem, despite this admission and apology. (*Id.*)

Then, in October 2012, months after Almunia had first warned Defendants of the BCS omission, Almunia charged Microsoft with what Plaintiffs appear to allege was *continued* non-compliance with the Settlement terms, and ordered Microsoft to remedy the omission for the Windows 8 operating system then about to go on sale in the EU. (*Id.* at 16.)

On March 6, 2013, the EU decided to fine Microsoft the U.S. equivalent of $732.2 million dollars for violating the Settlement. (*Id.*) According to Plaintiffs, this marked the first time in history that the EU had punished a company for violating the terms of an antitrust settlement. (*Id.*)

In response, Microsoft issued another apology, taking "full responsibility" for the error, but maintaining that the omission was caused when an engineering team forgot to update the code that distributed the BCS on to a "service pack." (*Id.* at 19.)

In light of the omission and resultant monetary loss to the company, on March 22, 2013, one Plaintiff issued a pre-suit demand ("Demand") that Microsoft's Board investigate and commence an action against certain current and former directors and executive officers of the company. (*Id.; see also* Demand, Dkt. No. 1, Ex. A.) Ten months later, on January 28th, 2014, that Plaintiff's counsel received a letter ("the Refusal") from counsel for Microsoft's "Demand Review Committee" (DRC) stating that the DRC had investigated the merits of the suit and that the Board had decided that it would not be in the Corporation's interests to pursue the matter through litigation. (*Id.* at 4.) A "Resolution of the Board of Directors," included in the three-page Refusal, stated that the DRC had reviewed thousands of documents and conducted "relevant witness interviews," and that the Board had concluded, on the basis of this information, that the Demand did not assert facts that supported a viable claim for breach of fiduciary duty. (*Id.*) The Board added that the Corporation had already adopted significant remedial measures before it had received the Demand. (*Id.*)

That particular Plaintiff's counsel contacted the DRC's counsel in search of further details regarding the identities of the purported interviewees. (*Id.* at 5.) The DRC's counsel declined to identify any specific witnesses, but stated that the group was comprised of thirty-six employees, board members, and executives from various Microsoft departments and divisions. (*Id.*) The DRC never claimed, and does not now claim, to have interviewed Almunia or any member of the European Commission, or anyone external to Microsoft. (*Id.*)

Convinced that the omission of external interviewees, especially of interviewees from the EU, demonstrated the Board's lack of investigatory due diligence and good faith, Plaintiffs filed the instant suit on April 11, 2014, derivatively on behalf of nominal Defendant Microsoft Corporation, against various current and former executive officers and directors for breach of

fiduciary duty in connection with the violation of the Settlement. (*Id.* at 1–2.) Plaintiffs' specific claims include "Count I Against All Defendants for Breach of Fiduciary Duty for Disseminating Inaccurate Information" (based on alleged omissions in SEC filings), "Count II Against All Defendants for Breach of Fiduciary Duties for Failing to Maintain Internal Controls," "Count III Against All Defendants for Breach of Fiduciary Duties for Failing to Properly Manage the Company," "Count IV Against All Defendants for Unjust Enrichment," "Count V Against All Defendants for Abuse of Control," and "Count VI Against All Defendants for Gross Mismanagement." (*Id.* at 23–26.) On behalf of the Corporation, Plaintiffs seek damages from the individual Defendants in the amount that was lost as a result of the Settlement violation, equitable relief compelling Microsoft to reform and improve its internal legal compliance procedures, restitution from each of the named Defendants in the amount of the compensation they received while allegedly allowing the Settlement breach to occur, and attorneys' fees. (*Id.* at 26–27.) Before the Court today are nominal Defendant Microsoft Corporation's Motion to Dismiss Complaint (Dkt. No. 19) and the Individual Defendants' Motion to Dismiss (Dkt. No. 23).

## II. DISCUSSION

### A. Motion to Dismiss Legal Standard

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may move for dismissal when the opposing party "fail[s] to state a claim upon which relief can be granted." To grant a motion to dismiss, the court must conclude that the moving party is entitled to judgment as a matter of law, even after accepting all factual allegations in the complaint as true and construing them in the light most favorable to the nonmoving party. *Fleming v. Pickard,* 581 F.3d 922, 925 (9th Cir.2009). There must be no genuine issues of material fact in dispute. *Id.*

However, to survive a motion to dismiss, a plaintiff must cite facts supporting a "plausible" cause of action. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555–56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

### B. Nominal Defendant Microsoft's Motion to Dismiss

Nominal Defendant Microsoft requests that the Court dismiss Plaintiffs' derivative action because its Board's decision not to accede to Plaintiffs' Demand and pursue the litigation is protected by the business judgment rule. (Nominal Defendant Microsoft Corporation's Motion to Dismiss Complaint, Dkt. No. 19.)

In order to proceed with a derivative suit after a board rejects a shareholder's demand, the shareholder must allege facts with particularity creating a reasonable doubt that the board's decision was entitled to the protection of the business judgment rule. *Grimes v. Donald,* 673 A.2d 1207, 1217 (Del.1996) (overruled on other grounds); *Stepak v. Addison,* 20 F.3d 398, 403 (11th Cir.1994). A board's refusal of a shareholder litigation demand merits presumptive protection by the business judgment rule unless a plaintiff alleges particular facts that support the inference that the board's investigation was unreasonable or that its decision making process was not undertaken in good faith. *Halpert Enterprises, Inc. v. Harrison,* 2007 WL 486561 at *5 (S.D.N.Y., Feb. 14, 2007) aff'd. 2008 WL 4585466 (2d Cir., Oct. 15, 2008); *Levine v. Smith,* 591 A.2d 194, 213 (Del.1991) (overruled on other grounds). Thus, when a board refuses a demand, courts will examine the "good faith and reasonableness of its investigation." *Spiegel v. Buntrock,* 571 A.2d 767, 777 (Del.1990). Vitally, "the court's inqui-

ry is not into the substantive decision of the board, but rather is into the procedures employed by the board in making its determination." *In re PSE & G Shareholder Litigation*, 173 N.J. 258, 291, 801 A.2d 295 (2002) (citing *Levine*, 591 A.2d at 214).

 There is no universal "prescribed procedure that a board must follow" in assessing shareholder demands. *Levine*, 591 A.2d at 214. Nevertheless, the board's process must reflect an "earnest attempt to investigate a shareholder's complaint." *PSE & G*, 173 N.J. at 292, 801 A.2d 295. Towards this end, directors have a duty to inform themselves of all material information reasonably available to them. *Mt. Moriah Cemetery on Behalf of Dun & Bradstreet Corp. v. Moritz*, 1991 WL 50149 at *4 (Del.Ch., Apr. 4, 1991) aff'd. 599 A.2d 413 (Del.1991). A board's refusal is not entitled to business judgment rule protection when "the investigation has been so restricted in scope, so shallow in execution, or otherwise so *pro forma* or half-hearted as to constitute a pretext or a sham." *PSE & G*, 173 N.J. at 292, 801 A.2d 295. More specifically, when a stockholder identifies a witness or set of witnesses "who should have been interviewed but were not" in connection with a board's investigation, a court may find that the investigation was unreasonable. *City of Orlando Police Pension Fund v. Page*, 970 F.Supp.2d 1022, 1032 (N.D.Cal.2013).

 Plaintiffs argue that the fact that the DRC and Board did not interview Mr. Almunia or any other European Commission official regarding the company's violation of the 2009 Settlement agreement with the EU is sufficient grounds for calling into question the reasonableness and

good faith nature of the Board's investigation. (Plaintiffs' Combined Opposition Brief, Dkt. No. 28 at 5.) This Court agrees.

It appears uncontested that the DRC's/Board's investigation consisted solely of interviewing the company's own employees, directors, and executives. (*See* Microsoft's Motion to Dismiss, Dkt. No. 19 at 8.) Microsoft attempts to obfuscate the interview issue in its briefing, claiming that such internal persons were the only ones with knowledge of the coding errors that caused the omissions of the BCS, and that Mr. Almunia and the European regulators would have been completely uninformed on these issues. (*Id.* at 14.)

But the far more relevant issue is that Microsoft was allegedly under a duty to self-monitor its compliance with the terms of the Settlement. Taking the facts alleged by Plaintiffs as true and making inferences in their favor, as we must at this stage, it is plausible that Mr. Almunia or another member of the Commission could reasonably have been expected to hold highly material information on topics such as the EU's expectations of Microsoft's internal compliance methodology, the content of the summer 2012 noncompliance warning, the reactions of the company to such warning, any promises that were made in response to this warning, and whether the company took any steps to ameliorate the BCS omission in the Windows 7 service pack after the private summer 2012 warning but before the October 2012 public warning. This is all the more likely because Mr. Almunia and other members of the European Commission conducted their own *external* investigation of the Settlement violation and the events that led to it.[1] (Plaintiffs' Combined Opposition Brief, Dkt. No. 28 at 12, 20.) The

---

1. This pattern of events parallels the Justice Department's investigation in *Page*. Microsoft attempts to distinguish *Page* by stating that in that case, the DOJ investigation had un-

earthed unique documents plausibly showing that the director defendants knew of Google's wrongful conduct but did nothing to correct it, but that here, Plaintiffs do not explicitly

DRC's failure to even attempt to speak with any individual who participated in that EC investigation[2] does raise questions about the diligence with which the DRC pursued its investigation. As the Northern District of California found similarly problematic in *Page*, the DRC did not interview a single individual who would have been likely to corroborate Plaintiffs'

claim that the EC found evidence or made findings inconsistent with the investigation performed by Microsoft. (Nominal Defendant Microsoft's Reply, Dkt. No. 30 at 8.) However, Plaintiffs allege in their Complaint that following the EC's investigation, Mr. Almunia stated that the EU had been "naïve" to put Microsoft in charge of monitoring its compliance with the Settlement. (Complaint, Dkt. No. 1 at ¶ 50.) This seems to suggest that Mr. Almunia and the EC did in fact find evidence that, while not contradicting Microsoft's finding that the violation was *directly caused by technical error*, was indicative of Defendant officers' culpability in *failing to intercept and correct the technical error*.

2. Even if the DRC consulted the EC's Decision/ investigation report, it is unreasonable for Microsoft to presume, as they do (*see* Nominal Defendant Microsoft's Reply, Dkt. No. 30 at 6), that a publically available summary of an investigation is likely to contain *all* the information unearthed in the investigation. Further, *that the EC concluded that the technical malfunctions that caused the BCS omission were a result of (the engineering team's) negligence is not mutually exclusive with the conclusion that the Board itself was negligent in failing to intercept and correct this key omission before releasing the software into the stream of commerce.* The focus of the EC Decision appears to be the *fact* of the violation of the Settlement, and establishing its source (*e.g.*, Microsoft writ large). Thus, the DRC's review of the EC Decision would not have been highly material to its review of the shareholder demands. But the investigation of the shareholders' demands *ought* to have had a very different focus than the EC's investigation, namely, whether the directors and executives had breached any fiduciary duties in allowing this Settlement violation to occur. Again, the DRC had a fiduciary duty to expose itself to all material information, including external, non-innocence-corroborating evidence. Therefore, it is reasonable of Plaintiffs

claims of wrongful conduct. (Complaint, Dkt. No. 1 at ¶ 62.)

Thus, by identifying this omission, Plaintiffs have satisfied their burden of "alleg[ing] facts with particularity[3] creating a reasonable doubt that the board is entitled to the benefit of the [business judgment rule] presumption."[4] *See Grimes*, 673

to argue that the DRC ought to have looked past the face of the not-entirely-on-point EC Decision, and instead interviewed the actual EC investigators to see if they had found, in the course of their investigation, any information pertinent to the manner in which the Individual Defendants discharged their Settlement verification and compliance duties.

3. Given that the core fact here is a "negative fact," *i.e.* a statement of who the Board did not interview, Plaintiffs are sufficiently "particular" with regard to this omission.

4. Microsoft makes several attempts to squeeze in additional pleading requirements that are supported neither by case law nor by common sense. *See e.g.*, Nominal Defendant's Motion to Dismiss, Dkt. No. 19 at 12–16 (implying that Plaintiffs must both plead particularized facts creating a reasonable doubt that the Board's Demand investigation was done in good faith (which they do), and separately, somehow, plead that the Board did not act in good faith in refusing the Demand; alleging that Plaintiffs have not pleaded that the Board breached its duty of loyalty (although Plaintiffs plead facts that raise serious doubts about the loyalty and disinterestedness of the Board); implying that Plaintiffs must plead with particularity the reasons why each of the investigatory steps taken by Defendant (which have still not been disclosed fully) were not "robust." (even though Plaintiffs have plead particularized facts regarding gaping material *omissions* from the investigation); arguing that Plaintiffs must address the *substantive* merits of the Board's decision, with regard to indemnification and self-insurance (flatly contradicting the extensive case law focusing exclusively on the procedural thoroughness of a board's decision, and ignoring the fact that Microsoft's indemnification clause is not available under certain circumstances arguably alleged by Plaintiff); arguing that *Plaintiffs* should have requested an interview with Mr. Almunia if they thought this would have

A.2d at 1219; *see also In re F5 Networks, Inc. Derivative Litigation,* 2007 WL 2476278 at *7 (W.D.Wash., Aug. 6, 2007) (adopting Delaware standard for rebutting the business judgment rule); *Spiegel,* 571 A.2d at 777. For motion to dismiss purposes, such failure to interview anyone outside the company regarding the violation of the Settlement does permit the inference that the DRC's investigation was *not* conducted in good faith and was *not* reasonable. When we interpret this omission in the light most favorable to the nonmoving party, we are led to the conclusion that the DRC's investigation was "restricted in scope," "shallow in execution," *"pro forma,"* and "half-hearted." *See PSE & G,* 173 N.J. at 292, 801 A.2d 295.[5] Therefore, although Defendant may ultimately show that no fiduciary duties were breached in the violation of the Settlement, at this stage of the litigation, it is premature to dismiss Plaintiffs' claims. Nominal Defendant Microsoft's Motion to Dismiss, (Dkt. No. 19), is therefore DENIED in full.

## C. Individual Defendants' Motion to Dismiss

Also before the Court is the Individual Defendants' 12(b)(6) Motion to dismiss the inadequate oversight, dissemination of inaccurate information, and unjust enrichment claims against them. The Court finds that dismissal on these issues is likewise premature, for the following reasons.

been helpful; and arguing, without citation to relevant case law, that Plaintiffs must demonstrate that Mr. Almunia's information would have "altered the total mix of information" available to the DRC). Such convolution of and addition to the relatively simple legal standard at play at this stage of the litigation is endemic to the Nominal Defendant's brief and will not be further addressed in this Order.

### 1. *Inadequate Oversight Claim*

Plaintiffs allege that the Individual Defendants breached their fiduciary duties to Microsoft by failing to maintain internal controls ("Count II"), by failing to properly manage the company ("Count III"), by abusing their control ("Count V"), and through gross mismanagement ("Count VI").

In addition to the general 12(b)(6) standards, Defendants argue that these various inadequate oversight claims must meet a heightened pleading standard set by *In re Caremark International, Inc. Derivative Litigation,* 698 A.2d 959 (Del. Ch.1996). Under this standard, plaintiffs must make plausible, non-conclusory factual allegations raising reasonable inferences that the defendants "knowingly caus[ed] or consciously permit[ed] the corporation to violate positive law, or fail[ed] utterly to establish a reporting system or other oversight mechanism to monitor the corporation's legal compliance." *South v. Baker,* 62 A.3d 1, 6 (Del.Ch.2012); *see also Caremark,* 698 A.2d at 971. However, Defendants admit that in the alternative, Plaintiffs may satisfy this heightened pleading requirement by alleging facts giving rise to a reasonable inference that the Individual Defendants, "having implemented such a system [of internal] controls, consciously failed to monitor or oversee its operation, thus disabling themselves from being informed of the risks or problems requiring their attention." *Stone ex rel. AmSouth Bancorporation v. Ritter,* 911 A.2d 362, 370 (Del.2006). In other words, Plaintiffs

5. As Plaintiffs' interview omission arguments are sufficient to deny business judgment rule protection to the Board's Refusal, the Court does not reach Defendant's alternate attacks on the Complaint (*e.g.,* that the Board had no legal obligation to deliver a report of its investigation to Plaintiffs and that Microsoft's acknowledgement of its technical error was not an admission that its directors breached any fiduciary duties).

must allege facts sufficient to raise an inference that the individual defendants "conscious[ly] disregard[ed]" their fiduciary duties to ensure legal compliance. *See Lyondell Chem. Co. v. Ryan,* 970 A.2d 235, 243 (Del.2009).

■ Even under this heightened standard, Plaintiffs have sufficiently pled their claim for inadequate oversight. Plaintiffs do not appear to dispute that Microsoft established oversight mechanisms and internal controls nominally dedicated to ensuring legal compliance, nor dispute that the elimination of the BCS was most directly caused by a technical error on the part of the engineering team. (*See e.g.,* Complaint, Dkt. No. 1 at ¶¶ 44, 50.) Plaintiffs do however, allege that "Defendants willfully ignored the obvious and pervasive problems with Microsoft's internal controls and practices and procedures and failed to make a good faith effort to correct these problems or prevent their recurrence." (*Id.* at ¶ 71.) Defendants label this "conclusory" and retort that this "burst of rhetoric comes unaccompanied by *any* supporting facts." (Defendants' Motion to Dismiss, Dkt. No. 23 at 11 (emphasis in original).) Despite Defendants' burst of boldface, Plaintiffs do plead several facts, which, when interpreted in the light most favorable to them, are more than sufficient to raise the inference that Defendants "consciously failed to monitor or oversee [the internal control system], thus disabling themselves from being informed of the risks or problems requiring their attention." *See Stone,* 911 A.2d at 370. To wit, Plaintiffs allege, and Defendants do not dispute, that: "Microsoft was directly responsible for monitoring its own compliance with the Settlement" (Complaint, Dkt. No. 1 at ¶ 3); that the terms of the Settlement obligated Microsoft to include the BCS on its systems (*id.* at ¶ 41); that as early as *February 2011,* the BCS was missing from over 15 million installations of Windows 7 in Europe (*id.* at ¶ 4); that

in *July 2012,* Mr. Almunia had to inform Defendants that some installations of Windows did not include the BCS (*id.* at ¶ 5); and that after the $732.2 million dollar fine was imposed, Defendants offered no explanation for why or how the technical errors had gone undetected, given that Microsoft was responsible for monitoring its own compliance (*id.* at ¶ 6). The inference that Defendants "consciously failed to monitor or oversee [internal legal compliance] operations" certainly may be drawn from the fact that a company such as Microsoft did not catch, over the course of almost a year and a half, that at least *15 million* installations of its product were missing a crucial element. This is especially true when: 1) this element was a feature that the Corporation was under a legal duty to include and to verify that it had included; 2) this element's inclusion was entirely responsible for recently saving the company from an antitrust suit and massive fines; and 3) this element's presence or absence was readily detectable even to average consumers installing the software. The pleading of such facts rises above the unacceptable "conclusory allegation[s] that because illegal behavior occurred, internal controls must have been deficient," (*see Desimone v. Barrows,* 924 A.2d 908, 940 (Del.Ch. 2007)), and instead constitutes a *Caremark*-sufficient showing of a "sustained or systemic failure to exercise oversight" (*see South,* 62 A.3d at 17–18). Thus, this Court denies Individual Defendants' Motion to Dismiss on the inadequate oversight claims.

### 2. *Dissemination of Inaccurate Information Claim*

■ Plaintiffs also allege that Defendants caused or allowed the Company to disseminate to Microsoft shareholders materially misleading and inaccurate information through, *inter alia,* public disclosures, press releases, and SEC filings, such as a 2011 Form 10–K Annual Report. ("Count

I," Complaint, Dkt. No. 1 at ¶¶ 44, 45, 65–68.) Plaintiffs allege that "Defendants failed to disclose [to shareholders] that under their direction, the Company was violating the terms of the Settlement, which could expose the Company to hundreds of millions of dollars in fines." (Plaintiffs' Combined Opposition, Dkt. No. 28 at 24–26.) Defendants argue that such claim is not cognizable unless there is scienter—*i.e.,* unless the Individual Defendants knew the error was occurring and deliberately withheld it from the shareholders. (Individual Defendants' Reply, Dkt. No. 29 at 7.) Defendants attempt to refute Plaintiffs' use of the "core operations inference" to establish Defendants' constructive knowledge by stating that the Ninth Circuit generally disfavors this inference. (Individual Defendants' Reply, Dkt. No. 29 at 8 (citing *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 1000 (9th Cir.2009)).) However, Defendants themselves admit that the Ninth Circuit makes an exception for use of the "core operations inference" where "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge on this matter." (Individual Defendants' Reply, Dkt. No. 29 at 9 (citing *Zucco Partners,* 552 F.3d at 1000).) Given the Court's analysis on the inadequate oversight issue and the scope and magnitude of the Settlement violation, *see* Section II(C)(1), *supra,* it is logically necessary that either Defendants failed to exercise adequate oversight over their straight-forward, single-issue compliance with the Settlement terms, or they exercised adequate oversight and *thus must have known*

about the violations that had occurred over *15 million* times over the course of seventeen-months.[6] Thus, the *Zucco* exception allowing the use of the core operations inference does not seem misplaced here. Accordingly, the Individual Defendants' Motion to Dismiss is denied as to the inaccurate disclosures claim.

### 3. *Unjust Enrichment Claim*

■ Finally, Plaintiffs allege that Defendants were unjustly enriched at the expense of Microsoft through the violation of the Settlement ("Count IV"), and seek restitution in the form of disgorgement of all compensation obtained by Defendants during the pertinent period. (Complaint, Dkt. No. 1 at 25.) Defendants argue that the Court must dismiss this claim if the Court dismisses the other breach of fiduciary duty claims against Defendants. (Individual Defendants' Reply, Dkt. No. 29 at 11.) We have not dismissed these claims. Further, Defendants state that Plaintiffs have failed to allege what benefit Defendants received from their involvement with the violation of the Settlement. (*Id.*) However, Plaintiffs make clear in their Brief in Opposition that the benefit to which Count IV refers is the compensation Defendants received *"as a result* of their false portrayal of Microsoft's true financial health." (Plaintiff's Combined Opposition Brief, Dkt. No. 28 at 28 (citing Complaint, Dkt. No. 1 at ¶¶ 93–95) (emphasis added).) Given our decision to allow Plaintiffs' inaccurate disclosure claim to go forward (*see* Section II(C)(2), *supra*), the unjust enrichment claim is properly pleaded as well and Defendants' Motion to Dismiss is likewise denied on this issue.[7] Therefore, the Indi-

---

**6.** This seems, in Defendants' own words, a paradigm case of the "knowledge being so widespread it could not have escaped defendants' attention." (*See* Individual Defendants' Reply, Dkt. No. 29 at 8.)

**7.** Further, the Court accepts Plaintiffs' argument that consideration of Microsoft's exculpatory provision is inappropriate *in this suit* at this stage of litigation, and that even if it were considered, it would not be a bar to litigation at the point that Plaintiffs *are* rea-

vidual Defendants' Motion to Dismiss (Dkt. No. 23) is DENIED in full.

## III. CONCLUSION

For the foregoing reasons, Nominal Defendant Microsoft Corporation's Motion to Dismiss Complaint (Dkt. No. 19) and Individual Defendants' Motion to Dismiss (Dkt. No. 23) are both DENIED in full.

sonably alleging non-indemnified bad faith and intentional misconduct on the part of Defendants. (*See* Plaintiffs' Combined Opposition Brief, Dkt. No. 28 at 29–31; *see also* *Orman v. Cullman*, 794 A.2d 5, 41 (Del.Ch. 2002) ("[I]f a complaint properly pleads a non-exculpated claim, that claim at least survives a motion to dismiss").)