**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2908-21

FEIVEL PHIL GOTTLIEB,
derivatively and on behalf of
JOHNSON & JOHNSON,

      Plaintiff-Appellant,

v.

MARY C. BECKERLE, D.
SCOTT DAVIS, IAN E.L.
DAVIS, ALEX GORSKY, MARK
B. McCLELLAN, ANNE M.
MULCAHY, WILLIAM D.
PEREZ, CHARLES PRINCE, A.
EUGENE WASHINGTON,
RONALD A. WILLIAMS,
MARY SUE COLEMAN,
JAMES G. CULLEN, LEO
F. MULLIN, MICHAEL
M.E. JOHNS, JOAQUIN
DUATO, PAUL STOFFELS,
JENNIFER L. TAUBERT,
JENNIFER A. DOUDNA,
MARILLYN A. HEWSON,
HUBERT JOLY, and MARK
A. WEINBERGER,

      Defendants-Respondents,

and

JOHNSON AND JOHNSON,

    Defendant-Respondent.

_____

Argued September 27, 2023 – Decided February 20, 2024

Before Judges Haas, Gooden Brown and Puglisi.

On appeal from the Superior Court of New Jersey, Chancery Division, Middlesex County, Docket No. C-000186-19.

Michael James Barry (Grant & Eisenhofer PA) argued the cause for appellant (The Law Office of Avram E. Frisch LLC and Michael James Barry, attorneys; Avram E. Frisch and Michael James Barry, on the briefs).

Kristen R. Seeger (Sidley Austin LLP) of the Illinois bar, admitted pro hac vice, argued the cause for respondent Johnson & Johnson (Robinson Miller LLC, Kristen R. Seeger, Walter C. Carlson, (Sidley Austin LLP) of the Illinois bar, admitted pro hac vice, Christopher Y. Lee (Sidley Austin LLP) of the Illinois Bar, admitted pro hac vice, and Maseeh Moradi, (Sidley Austin LLP) of the Illinois Bar, admitted pro hac vice, attorneys; Keith J. Miller, Kristen R. Seeger, Walter C. Carlson, Christopher Y. Lee and Maseeh Moradi, on the brief).

Riker Danzig, LLP, attorneys for respondents Mary C. Beckerle, D. Scott Davis, Ian E.L. Davis, Alex Gorsky, Mark B. Mcclellan, Anne M. Mulcahy, William D. Perez, Charles Prince, A. Eugene Washington, Ronald A. Williams, Mary Sue Coleman, James G. Cullen, Leo

F. Mullin, Michael M.E. Johns, Joaquin Duato, Paul Stoffels, Jennifer L. Taubert, Jennifer A. Doudna, Marillyn A. Hewson, Hubert Joly, and Mark A. Weinberger, join in the brief of respondent Johnson & Johnson.

PER CURIAM

Plaintiff Feivel Gottlieb is the owner of three shares in the global health care corporation, Johnson & Johnson (J&J). He filed a shareholder derivative complaint on behalf of J&J against J&J as a nominal defendant and J&J's officers and directors in their individual capacities (collectively, defendants), alleging breach of the directors' fiduciary duties in connection with the company's alleged misleading marketing of three opioid analgesics, Duragesic, Nucynta, and Nucynta ER. Defendants moved to dismiss plaintiff's complaint, arguing plaintiff failed to meet the statutory requirements for bringing a shareholder derivative claim under the New Jersey Business Corporation Act (NJBCA), N.J.S.A. 14A:1-1 to 18-11. The motion judge agreed and entered two separate orders, both dated February 1, 2022, along with an accompanying twenty-seven-page written opinion, dismissing plaintiff's complaint with prejudice for failure to state a claim upon which relief can be granted, see R.

3

A-2908-21

4:6-2(e).[1] Plaintiff now appeals from the February 1, 2022, orders.[2] After carefully reviewing the record and the governing legal principles, we affirm.

## I.

Some background is necessary for context. The NJBCA sets forth the procedures for derivative claims like this one. Such claims "belong[] to a corporation" but are brought by a shareholder "on behalf of that corporation, in an attempt to compel alleged wrongdoers to compensate the corporation for the injury they have caused." Johnson v. Glassman, 401 N.J. Super. 222, 227-28 (App. Div. 2008). To bring a derivative claim in the first instance, a shareholder

---

[1] One order dismissed the complaint against J&J and the other order dismissed the complaint against the individual defendants.

[2] The trial court also denied plaintiff's motion for reconsideration in a May 9, 2022, order. However, because plaintiff neither identified the May 9, 2022, order in his notice of appeal or amended notice of appeal, nor delineated a legal challenge to the order in any point heading in his merits brief, we consider the issue effectively waived. See 1266 Apartment Corp. v. New Horizon Deli, Inc., 368 N.J. Super. 456, 459 (App. Div. 2004) ("[I]t is only the judgment or orders designated in the notice of appeal which are subject to the appeal process and review . . . ."); N.J. Dep't of Env't Prot. v. Alloway Twp., 438 N.J. Super. 501, 505 n. 2 (App. Div. 2015) ("An issue that is not briefed is deemed waived upon appeal."); see also Pressler & Verniero, Current N.J. Court Rules, cmt. 2 on R. 2:6-2 (2024) (explaining that appellate courts "may refrain from considering cursory arguments . . . that are not properly submitted under proper point headings" (citing Solar Energy Indus. v. Christie, 418 N.J. Super. 499, 508 (App. Div. 2011))).

must be both a current owner and have owned shares of the corporation "at the time of the act or omission complained of," "fairly and adequately represent[] the interests of the corporation," N.J.S.A. 14A:3-6.2(1), (2), and make "a written demand" on "the corporation to take suitable action" before filing suit, N.J.S.A. 14A:3-6.3(1).

After receiving a written demand for action from a shareholder, a corporation can conduct an inquiry into the allegations in the demand, and a majority of the independent directors of the board can determine whether to accept or reject the demand. N.J.S.A. 14A:3-6.4 to 6.5. Under the NJBCA, a director is considered independent if the director has:

> (i)  no economic interest in the challenged act or transaction material to him or her, other than an economic interest that is shared by all shareholders generally; and
>
> (ii) no material, personal or business relationships with the defendant directors or officers who have a material interest in the act or transaction challenged.
>
> [N.J.S.A. 14A:3-6.5(7)(a).]

If a shareholder's demand is rejected, and the shareholder chooses to bring a derivative lawsuit to challenge the rejection, the complaint "shall allege with particularity facts establishing that a majority of the board of directors . . . did not consist of independent directors at the time the determination was made."

5

N.J.S.A. 14A:3-6.5(3); see also R. 4:32-3 (setting forth prerequisites for filing a shareholder derivative complaint, including pre-suit demand by a plaintiff for the "desired" "action" by "managing directors or trustees").

On the corporation's dismissal motion, "a derivative proceeding shall be dismissed by the court" if the court finds that "a majority vote of independent directors present at a meeting of the board of directors," N.J.S.A. 14A:3-6.5(1), (2), has "determined in good faith, after conducting a reasonable inquiry upon which its conclusions are based, that the maintenance of the derivative proceeding is not in the best interests of the corporation." N.J.S.A. 14A:3-6.5(1)(a) (hereinafter referred to as subsection (1)). If a majority of the directors were independent at the time the determination was made, "the plaintiff shall have the burden of proving that the requirements of subsection (1) . . . have not been met." N.J.S.A. 14A:3-6.5(4). If a majority of the directors were not independent at the time the determination was made, "the corporation shall have the burden of proving the requirements of subsection (1) . . . have been met." Ibid.

On appeal, plaintiff has abandoned his challenge to the independence of the board members who voted to reject his derivative claim. Instead, plaintiff

6                                                                 A-2908-21

disputes whether the directors acted in good faith after conducting a reasonable inquiry in accordance with N.J.S.A. 14A:3-6.5(5), which provides:

> (a) If the corporation moves to dismiss the derivative proceeding, it shall make a written filing with the court setting forth, among other things, facts to show:
>
>> (i) whether or not a majority of the board of directors was independent at the time of the determination by the independent director or directors; and
>>
>> (ii) that the independent director or directors made the determination in good faith and after conducting a reasonable inquiry upon which the conclusions are based.
>
> (b) Following a motion filed pursuant to paragraph (a) . . . , the court shall dismiss the derivative suit unless:
>
>> (i) the court finds that the requirements of subsection (1) . . . have not been met, taking into account the burden of proof . . . ; or
>>
>> (ii) the plaintiff . . . has alleged with particularity facts rebutting the facts contained in the corporation's filing.

## II.

Turning to the salient facts, in 1991, 2008, and 2015, the FDA approved the marketing of three drugs introduced by J&J and its subsidiary, Janssen.

7

These drugs, Duragesic, Nucynta, and Nucynta ER, are all forms of opioids developed by J&J. In May 2019, plaintiff served a written demand on the board, alleging J&J's directors and officers breached their fiduciary duties to J&J and its shareholders by failing to stop misleading marketing relating to these opioids. J&J had previously received similar demands from other shareholders.

In response to the first shareholder demand letter, on October 18, 2017, by resolution, the board had retained Douglas Eakeley, Esq., of counsel to Lowenstein Sandler LLP, as independent counsel "to investigate, review, and analyze the facts and circumstances surrounding the allegations raised . . . as well as any subsequently received demands or shareholder derivative lawsuits making similar allegations or claims." The board resolution also specified that the board had resolved to provide Eakeley with "whatever resources" were needed "to conduct a thorough and independent [i]nvestigation" and to appoint "a liaison" between the board and Eakeley "to help facilitate [the i]nvestigation." Further, "any management member of the [b]oard" was "excused from its deliberations."

Several J&J shareholders had already filed derivative complaints in various federal and state courts that largely mirrored the allegations in the demand letters Eakeley was investigating. As of the date of Eakeley's retention,

"there were an estimated [fifty] cases pending in federal courts around the country, [thirty-six] pending state court actions, and six pending investigations relating to the promotion and marketing" of J&J's opioid products from 1997 to 2015. On November 4, 2019, plaintiff filed his original verified derivative complaint that is the subject of this appeal and encompassed in Eakeley's investigation.

During the investigation, Eakeley and his team reviewed over 5.5 million documents, including business records, deposition transcripts from the opioid litigation, reports of the parties' expert witnesses, and transcripts of the proceedings. They also "interviewed twelve current and former officers, directors, and employees of J&J/Janssen" and submitted document demands for records such as board meeting minutes, board meeting materials and presentations, J&J's and Janssen's policies and procedures with respect to sales force training, documents detailing J&J's health care compliance, documents relating to the marketing and promotion of the opioid products, documents tracking rates of addiction, abuse, and diversion of the opioid products, FDA approved labels for the opioid products, and correspondence with the FDA.

On April 13, 2020, Eakeley produced a 100-page report, which found that "it [was] not in the best interests of [J&J] to initiate litigation based upon the

9

claims in the [s]hareholder [d]emand [l]etters or to pursue the currently pending derivative litigation." Eakeley's report found plaintiff's demand letter and derivative complaint, along with the other demand letters and complaints, incorporated "the allegations advanced in a large volume of separate litigation pending against J&J" alleging that "J&J, acting in concert with other opioid manufacturers, caused or contributed to the nation's opioid crisis through false and misleading promotional practices in order to enhance sales for all opioids, generally, as well as J&J's own opioid products, specifically."

In particular, Eakeley found the complaints asserted that "J&J and others falsely and misleadingly downplayed the serious risk of addiction that all opioids present" by: (1) "concealing the link between long-term use of opioids and addiction;" (2) "masking the signs of addiction through promoting the concept of 'pseudoaddiction' (i.e., advocating that the signs of addiction should be treated with more opioids);" (3) "misrepresenting that opioid dependence and withdrawal are easily managed;" and (4) "misrepresenting, denying, or omitting the risks inherent in higher opioid dosages."

The report concluded:

> [T]here was no breach of the fiduciary duties of care, loyalty, or good faith by the [b]oard of [d]irectors or senior management of the [c]ompany. Senior management was diligent in creating and upgrading the

10

[c]ompany's [h]ealth [c]are [c]ompliance organization and systems, as well as its information and reporting systems, and in reporting regularly to the [b]oard with respect to the adequacy and appropriateness of such organizations and systems. The [b]oard and its committees were similarly diligent in monitoring the [c]ompany's compliance organization and its information and reporting systems, and in responding to reports of potential noncompliance requiring correction.

Moreover, and despite the proliferation of the [o]pioid [l]itigation . . . our investigation uncovered no "red flags" or other warning signs of misconduct by Janssen . . . that should have put either the [b]oard or senior management on notice of wrongdoing or the need for corrective action during the time period at issue. With regard to its opioid products, J&J received a single [w]arning [l]etter during the [twenty-four] years that Janssen marketed, promoted and sold Duragesic and Nucynta. That letter was received in 2004 . . . and related to even earlier promotional conduct; therefore, even if it were a basis for a claim, pursuing it at this late date would be problematic, if it is even possible. And Janssen promptly responded to the [w]arning [l]etter by ceasing and remedying the challenged conduct in a fashion acceptable to the FDA.

. . . [T]he [a]udit [c]ommittee received reports confirming that the [h]ealth [c]are [c]ompliance organization was appropriately policing the J&J/Janssen compliance system . . . . [a]nd . . . . the [c]ompany's regular reporting mechanisms did not indicate that Duragesic or Nucynta were subject to material abuse or misuse warranting corrective action.

The report advised:

11

The [b]oard now must decide what action to take with respect to the [s]hareholder [d]emand [l]etters and [d]erivative [c]omplaints. In essence, the [b]oard has three options: (1) initiate litigation against certain individuals as demanded in the letters and/or continue with the litigation by taking over from the shareholder plaintiffs; (2) stand aside and let the shareholders pursue their derivative claims on behalf of the [c]ompany; or (3) reject the shareholder demands and seek dismissal of the pending [d]erivative [c]omplaints. As the preceding sections of this [r]eport make clear, we believe that it is not in the best interests of the [c]ompany to initiate litigation based upon the claims in the [s]hareholder [d]emand [l]etters or to pursue the currently pending derivative litigation. We therefore recommend that the [b]oard should reject the [s]hareholder [d]emand [l]etters and take whatever steps are necessary or appropriate to secure dismissal of the [d]erivative [c]omplaints.

On April 23, 2020, Eakeley presented his report and findings at a meeting of the board of directors. The report had been distributed to each director on April 13, 2020, ten days in advance of the meeting. After discussing the report and asking questions of Eakeley, the board members adopted resolutions to "refuse[] as contrary to the best interests of the [c]ompany" the shareholder demands, including plaintiff's; to "decline[] to have the [c]ompany pursue the litigation contemplated in the shareholder demands"; and to "direct[] that the [c]ompany take such steps as are necessary or appropriate to secure dismissal of the derivative litigation."

12

After receiving Eakeley's report, plaintiff filed an amended complaint on May 29, 2020. In the amended complaint, plaintiff alleged the directors violated their fiduciary duties by: (1) "declining to stop and prevent J&Js illegal marketing and promotion of off-label uses of J&J's opioid drugs despite numerous red flags indicating widespread illegality"; (2) "[f]ailing to act to stop and prevent J&J's illegal kickbacks to healthcare professionals and organizations for prescribing, recommending or using J&J opioid drugs" in violation of law; and (3) "[a]pproving and/or consciously disregarding J&J's business plan of marketing its drugs through the widespread illegal promotion of off-label uses and dosages and through illegal kickbacks . . . to maximize J&J's short-term profit at the expense of shareholder's long-term interests and J&J's reputation and goodwill."

The complaint also alleged the corporate officers breached their fiduciary duties "by causing J&J to employ a deliberate and systematic business plan of artificially increasing sales by engaging in unlawful sales and promotion practices . . . ." Plaintiff further alleged that these practices "unjustly enriched" the individual defendants "as a result of the compensation and director renumeration they received while breaching fiduciary duties owed to J&J."

Defendants moved to dismiss plaintiff's complaint, arguing plaintiff failed to meet the burden of proof required under the NJBCA. Plaintiff opposed the motions, arguing, among other things, that Eakeley was not independent based on his and his law firm's "irreconcilable conflicts of interest" stemming from representing J&J for over thirty years. Following oral argument, the judge entered separate orders on February 1, 2022, with accompanying written decisions dated January 30, 2022, granting defendants' motions and dismissing plaintiff's complaint with prejudice.

Specifically, the judge found plaintiff "failed to satisfy his burden of proving that the board's inquiry was unreasonable or in bad faith." According to the judge,

> the record demonstrates that the [b]oard acted with good faith in investigating the merits of the claims and rejecting [p]laintiff's demand. In response to the demands which preceded [p]laintiff's, the [b]oard retained . . . Eakeley to conduct an independent investigation and generate a report on the facts and circumstances regarding the shareholders' allegations to the [b]oard. . . . Eakeley's investigation lasted over two years. . . . Eakeley focused his investigation on the allegations of false and misleading promotion by Janssen and its opioid prescription medications. The investigation consisted of reviewing more than 5.5 million pages of documents ranging from [b]oard materials to marketing documents relating to J&J's opioid products, to relevant policies, procedures, and compliance documents, to communications with

14

regulators, and other materials. . . . Eakeley's team also reviewed pleadings, motions, briefs, deposition and trial transcripts and exhibits, expert reports, and other materials from the [o]pioid [l]itigation. . . . Eakeley also interviewed key individuals, including current and former J&J directors, officers, and employees. Following the investigation, . . . Eakeley wrote a 100-page [r]eport detailing the scope and procedures of the investigations, as well as the legal analysis and recommendations.

The [c]ourt finds and believes that the procedures taken by . . . Eakeley . . . demonstrate that the [b]oard made a reasonable inquiry into . . . [p]laintiff's demands.

In rejecting plaintiff's challenge to Eakeley's independence, the judge applied the governing principles and determined plaintiff's arguments "f[e]ll far short" of the requisite standard because "J&J was not a significant client of Lowenstein Sandler or . . . Eakeley when . . . Eakeley undertook his investigation." The judge explained:

Eakeley's last work involving J&J was in 2013, when . . . Eakeley served a limited role as local counsel in two cases for a J&J subsidiary. Between January 2016 and November 2020, excluding revenues received in connection with [plaintiff's] derivative litigation, J&J made up only 0.08[ percent] of Lowenstein Sandler's overall [revenue], and between 2012 and 2015 only 0.41[ percent] or less. Lowenstein Sandler is not within the top 175 outside law firms that J&J has paid since 2004. Plaintiff's claim that . . . Eakeley was "lead counsel" for J&J in several federal district court cases is also unavailing. Plaintiff makes this claim on the

15

basis that . . . Eakeley is listed as "lead counsel" on the docket for a number of these cases. The district court lists . . . Eakeley as "lead counsel" because he was the lead <u>local</u> counsel for these cases, not the overall lead counsel. In fact, these cases generated income for Lowenstein Sandler representing between 0.03[ percent] and 0.41[ percent] of its yearly revenue. Further, . . . Eakeley is <u>of counsel</u> at Lowenstein Sandler, meaning he is an independent contractor of the firm and does not receive a salary or benefits and does not share in the firm's profits. . . . Eakeley's primary employment is as a law professor at Rutgers Law School.

. . . Simply put, [p]laintiff's allegations that Lowenstein Sandler and . . . Eakeley were dependent on J&J contradict the facts and do not allow [p]laintiff to meet his burden of proving an unreasonable or bad faith inquiry.

In this ensuing appeal, plaintiff raises the following points for our consideration:

POINT I

EAKELEY LACKED INDEPENDENCE AND THE BOARD LACKED ANY REASONABLE BASIS TO RELY ON HIM TO CONDUCT AN OBJECTIVE INVESTIGATION IN[]TO ALLEGATIONS OF ILLEGAL OPIOIDS MARKETING.

POINT II

THE BOARD'S INQUIRY WAS UNREASONABLE AND THE COURT'S ANALYSIS WAS INCORRECT BECAUSE THEY BOTH ADDRESSED ONLY POTENTIAL OVERSIGHT CLAIMS.

16

POINT III

THE BOARD'S INQUIRY WAS UNREASONABLE
BECAUSE THE BOARD FAILED TO PARTICIPATE
AT ALL IN EAKELEY'S INVESTIGATION.

III.

We review "de novo the trial court's determination of [a] motion to dismiss under Rule 4:6-2(e)" and we owe "no deference to the trial court's legal conclusions." Dimitrakopoulos v. Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, P.C., 237 N.J. 91, 108 (2019). On a motion to dismiss, a plaintiff need not prove the case, but need only "make allegations which, if proven, would constitute a valid cause of action." Kieffer v. High Point Ins. Co., 422 N.J. Super. 38, 43 (App. Div. 2011) (quoting Leon v. Rite Aid Corp., 340 N.J. Super. 462, 472 (App. Div. 2001)). Only where "even a generous reading of the allegations does not reveal a legal basis for recovery" should the motion be granted. Ibid. (quoting Edwards v. Prudential Prop. & Cas. Co., 357 N.J. Super. 196, 202 (App. Div. 2003)).

When evaluating whether a corporation's board of directors acted in good faith and with reasonable care in investigating the merits of a shareholder's derivative claim, "the court's inquiry is not into the substantive decision of the board, but rather . . . into the procedures employed by the board in making its

17

determination."  In re PSE & G S'holder Litig., 173 N.J. 258, 291 (2002) (internal quotation marks omitted).

> In that regard, there is "no prescribed procedure that a board must follow."  Nonetheless, the process should be such that a reviewing court can look to it and conclude confidently that it reflects a corporation's earnest attempt to investigate a shareholder's complaint.  Stated differently, the inquiry is whether the "investigation has been so restricted in scope, so shallow in execution, or otherwise so pro forma or half hearted as to constitute a pretext or a sham[.]"
>
> [Id. at 291-92 (alteration in original) (citations omitted) (first quoting Levine v. Smith, 591 A.2d 194, 214 (Del. 1991), overruled on other grounds, Brehm v. Eisner, 746 A.2d 244 (Del. 2000); and then quoting Stoner v. Walsh, 772 F. Supp. 790, 806 (S.D.N.Y. 1991)).]

"One of a board's prerogatives in this context is 'to entrust its investigation to a law firm[.]'"  Id. at 292 (alteration in original) (quoting Stepak v. Addison, 20 F.3d 398, 405 (11th Cir. 1994)); see also 2 Principles of Corp. Governance § 7.09(a)(2) (1994) (instructing that shareholder demands should be considered by board of directors with assistance of counsel "of its choice").  Where the board retains counsel of its choice to conduct such an investigation, "the critical question is whether [the board] demonstrated bad faith or acted unreasonably in relying on that firm's investigation."  PSE & G, 173 N.J. at 292-93.

Our courts look to Delaware law for guidance in assessing director liability in shareholder derivative suits alleging wrongdoing on the part of the board of directors. Cain v. Merck & Co., 415 N.J. Super. 319, 332 (App. Div. 2010) (citing Lawson Mardon Wheaton, Inc. v. Smith, 160 N.J. 383, 398 (1999)). Such disputes typically fall into two categories: (1) liability on the board resulting from a decision that results in a loss to the corporation "because that decision was ill[-]advised or 'negligent'"; or (2) liability for a loss that resulted from "an unconsidered failure of the board to act in circumstances in which due attention would, arguably, have prevented the loss." In re Caremark Int'l, Inc. Derivative Litig., 698 A.2d 959, 967 (Del. Ch. 1996) (emphasis omitted).

In the former class of cases, also known as direct liability cases, "director action is analyzed under the business judgment rule, which prevents judicial second guessing of the decision if the directors employed a rational process and considered all material information reasonably available—a standard measured by concepts of gross negligence." In re Citigroup Inc. S'holder Derivative Litig., 964 A.2d 106, 122 (Del. Ch. 2009); see also Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 177 (2011) (explaining that the presumption of validity applicable under the business judgment rule can only "be rebutted . . . if the

19

challenged corporate actions are so far from the norm of responsible corporate behavior as to be unconscionable or constitute a fraud, impermissible self-dealing or corporate waste").

In the latter group—oversight cases, also known as Caremark claims—a plaintiff is required to show:

> (a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations. Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.
>
> [In re Citigroup, 964 A.2d at 123 (emphasis omitted) (quoting Stone v. Ritter, 911 A.2d 362, 370 (Del. 2006)).]

"[I]ndeed, a showing of bad faith is a necessary condition to director oversight liability." Ibid. (emphasis omitted). Still, "directors' good faith exercise of oversight responsibility may not invariably prevent employees from violating criminal laws, or from causing the corporation to incur significant financial liability, or both." Stone, 911 A.2d at 373.

A-2908-21

Applying these principles, we affirm substantially for the reasons expressed in the judge's well-reasoned January 30, 2022, written decisions. We are satisfied plaintiff failed to demonstrate the board did not conduct a good faith or reasonable inquiry into his allegations in accordance with the NJBCA. On the contrary, we conclude with confidence that the investigation "reflects a corporation's earnest attempt to investigate a shareholder's complaint." PSE & G, 173 N.J. at 292.

Like the judge, we reject plaintiff's argument that the board's lack of good faith and due care is evident in its selection of Eakeley to investigate the allegations because Eakeley lacked independence given Eakeley's and Lowenstein's "[thirty]-year history of defending J&J and its corporate interests." In the absence of a disabling conflict of interest, there is no requirement that the attorney retained to investigate a litigation demand have no prior relationship with the company or the targets of the investigation. See PSE & G, 173 N.J. at 292-93 (noting that "a disabling conflict" would taint the investigation and pointing out that although the investigating firm "needlessly risked creating a conflict by briefly assuming a dual role as the Board's investigator and litigation counsel," the Board did not demonstrate bad faith or act unreasonably "in relying on th[e] firm's investigation"); Stepak, 20 F.3d at 400 (reversing dismissal of

shareholder derivative suit where "the Board's investigation and consideration of the [shareholder's] demand was dominated by a law firm that had represented the alleged wrongdoers in criminal proceedings involving the very subject matter of the demand").

Indeed, "[e]ven though [the investigating attorney] might have previously represented [the company] and previously recommended rejection of shareholder demands, that does not establish sufficient bias or lack of independence to make [his or her] selection unreasonable." Levine v. Liveris, 216 F. Supp. 3d 794, 810 (E.D. Mich. 2016). Further, where, as here, the plaintiff alleges no ties between the attorney and the individual directors and no involvement by the attorney with any of the challenged conduct, and "has offered only general, conclusory allegations regarding the process by which [the investigating attorney] was selected[,]" then the plaintiff "has not rebutted the presumption that [the investigating attorney] was retained in good faith and after a reasonable investigation." Ibid. Moreover, as the judge pointed out, plaintiff overstated the nature and extent of Eakeley's and Lowenstein's prior history representing J&J.

We also reject plaintiff's contention that the board unreasonably selected Eakeley given "Eakeley's obvious and abject failure[] in the Risperdal

investigation." By way of background, in 2010 and 2011, Eakeley was retained by a Special Committee of the J&J board to investigate shareholder demands and derivative complaints alleging, among other things, that J&J's subsidiary Janssen had engaged in off-label promotion of the antipsychotic drug Risperdal. After a year-long investigation, that included interviewing Alex Gorsky, the then Vice Chairman of the J&J Executive Committee, Eakeley issued a report presenting his findings and recommendations.

Although the report concluded "that Janssen did not intentionally promote Risperdal for off-label usage," and recommended rejecting the shareholder demands, the report discussed, among other things, the then-pending Department of Justice investigation into Janssen's "alleged off-label promotion of Risperdal" and explicitly recognized that "a sizeable settlement" was possible. Subsequently, as predicted in the report, the related shareholder derivative litigation settled. Although the stipulation of settlement acknowledged Eakeley's investigation, none of the objections to the settlement ever challenged the independence of the investigation. Moreover, a prior recommendation to reject shareholder demands does not disqualify an attorney. See Levine, 216 F. Supp. 3d at 810.

Likewise, we reject plaintiff's assertion that the board's reliance on the report was unreasonable because Eakeley did not investigate claims of "direct violations" in the illegal marketing campaign by J&J directors and officers, "only potential claims involving directors' oversight duties." However, plaintiff's conclusory allegations neither identified any specific J&J board member or officer nor pled with particularity any claim of direct wrongdoing by a director or officer in the marketing of opioid products.[3] Nevertheless, Eakeley, in fact, investigated allegations of direct wrongdoing in relation to the improper marketing of opioids at J&J.

Equally unavailing is plaintiff's contention that the board abdicated its responsibility to investigate plaintiff's allegations by abandoning its responsibility to oversee and direct the investigation. The board was entitled to

---

[3] On appeal, plaintiff argues that "the [d]emand detailed direct wrongdoing by Gorsky and the [b]oard's direct participation by promoting Gorsky and thereby approving his actions." According to the demand and the complaint, Gorsky "was in charge of Janssen during its illegal Risperdal marketing campaign" and "the [b]oard ratified his misconduct" by appointing him CEO on February 21, 2012, exposing the company to liability. Defendants counter that "eight of the twelve [d]irectors" who voted "to reject [p]laintiff's [d]emand in 2020 were not even on the [b]oard" when Gorsky was appointed CEO in 2012. Regardless, these are still oversight claims. See, e.g., South v. Baker, 62 A.3d 1, 14 (Del. Ch. Ct. 2012) ("A Caremark claim contends that the directors set in motion or 'allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in doing so they violated a duty to be active monitors of corporate performance.'" (quoting Caremark, 698 A.2d at 967)).

retain independent counsel of its choice to conduct the investigation, and nothing about Eakeley's process, or his legal or factual analysis, was so deficient that the board's reliance on his comprehensive investigation and exhaustive report was unreasonable. See PSE & G, 173 N.J. at 294 ("Based on the procedures employed and the seriousness by which the [investigating law firm] approached its task, we are satisfied that defendants have satisfied their burden of demonstrating that they acted in good faith and with due care in evaluating the litigation."); Lowinger v. Oberhelman, 924 F.3d 360, 369 (7th Cir. 2019) ("[N]othing about [the investigating attorney's] process, or its legal or factual analysis, was so egregiously deficient that the Board was grossly negligent to rely on it.").

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

25

A-2908-21